IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 05-0208 WHA |
| Plaintiff, | |
| v. | **ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL AND MOTION FOR NEW TRIAL** |
| JUDY GREEN, | |
| Defendant. | |

## INTRODUCTION

In this wire-fraud and antitrust prosecution, defendant Judy Green moves for a judgment of acquittal pursuant to FRCrP 29, and for a new trial pursuant to FRCrP 33. For the reasons stated below, defendant's motions are **DENIED**.

## STATEMENT

Congress created the E-Rate program as part of the Telecommunications Act of 1996. The Universal Service Fund, which was controlled by the Federal Communications Commission, funded the E-Rate program. Congress gave the FCC discretion to administer the Fund, which it did through independent entity, the Universal Service Administrative Company. USAC administered the E-Rate program.

The FCC regulation required schools to seek competitive bids on all services for which they sought E-Rate funds. The FCC stated that, once competitive bidding had been completed, schools did not have to select the lowest bids offered, although price was supposed to have been

the primary factor. All participants in the E-Rate program were required to abide by the FCC regulations, although the offenses charged in this case are not for violations of FCC regulations. Under the E-Rate program, there were requirements regarding co-pay and eligible services and equipment.

      Defendant Judy Green became acquainted with the E-Rate program as a teacher in Los Angeles. Then she migrated to being a consultant for school districts to induce them to apply for E-Rate grants and to guide them through the process. Video Network Communications, Inc. ("VNCI") manufactured video teleconferencing switches. It provided equipment and services for projects funded by the E-Rate program. For most of the relevant period, defendant worked as a sales representative for VNCI, and she marketed VNCI products to educational institutions. Wearing a different hat, as stated, defendant also acted as a consultant to local school districts and guided them in designing computer networks, in identifying government-sponsored funding sources, and applying for the funds. As part of the process of applying for E-Rate funds, defendant submitted or helped districts submit Form 471s to USAC.

      Defendant was charged with eleven counts of wire fraud in violation of 18 U.S.C. 1343. The wire fraud scheme was intended to deceive the FCC and USAC into believing that the various school districts were applying for E-Rate funds to pay only for *eligible* equipment, when, in reality, the costs of *ineligible* services and equipment were deceptively included by her. Another part of the scheme was to make the USAC believe that the school districts would pay the requisite co-pays even though entire projects (including the co-pays) ended up being funded by E-Rate, *i.e.*, roundabout ways were invented to fund the co-pay via government funds, as intended all along by defendant. To secure E-Rate funding, defendant caused fraudulent information to go to USAC. On the basis of the false representations, USAC

1  authorized funding to the school districts. The alleged wirings were not fraudulent in
2  themselves. Rather, they purportedly advanced the basic scheme and were as follows:

3

| Count | Project | Wiring | Source |
|---|---|---|---|
| 1 | West Fresno | Email dated June 19, 2000 | Indict. at ¶ 25 |
| 2 | Highland Park | Fax dated May 31, 2000 | Indict. at ¶ 30 |
| 3 | Covert | Email dated March 19, 2001 | Indict. at ¶ 36 |
| 4 | Lee County | Email dated February 22, 2001 | Indict. at ¶ 41 |
| 5 | Jasper County | Email dated April 10, 2001 | Indict. at ¶ 46 |
| 6 | Ecorse | Email dated May 29, 2001 | Indict. at ¶ 51 |
| 7 | Ceria Travis | Email dated August 27, 2001 | Indict. at ¶ 56 |
| 8 | Muskegon Heights | Email dated May 30, 2000 | Indict. at ¶ 61 |
| 9 | SFUSD | Fax dated August 21, 2000 | Indict. at ¶ 66 |
| 10 | W.E.B. DuBois | Email dated June 28, 2000 | Indict. at ¶ 71 |
| 11 | Luther Burbank | Fax dated May 25, 2001 | Indict. at ¶ 78 |

14       Defendant was also charged with ten counts of antitrust violations under 15 U.S.C. 1,
15  that is, the indictment alleged that she conspired with others to restrain competition in violation
16  of the Sherman Act. According to the indictment, the substantial terms of the agreement were:
17  (i) to allocate the projects among the defendants and co-conspirators; (ii) to submit collusive,
18  non-competitive, and rigged bids for the projects; and (iii) to provide equipment and services
19  for the project and receive payment from USAC as a result of the allocation and collusive
20  bidding. The antitrust counts are summarized as follows:

| Count | Project | Approximate Time Frames | Source |
|---|---|---|---|
| 12 | West Fresno | November 1998–June 2001 | Indict. at ¶ 79 |
| 13 | Highland Park | November 1998–July 2001 | Indict. at ¶ 90 |
| 14 | Covert | November 1999–July 2001 | Indict. at ¶ 95 |
| 15 | Lee County | November 1999–July 2001 | Indict. at ¶ 100 |
| 16 | Jasper County | November 1999-July 2001 | Indict. at ¶ 105 |
| 17 | Ecorse | November 1999–July 2001 | Indict. at ¶ 110 |
| 18 | Ceria Travis | November 1999–July 2001 | Indict. at ¶ 115 |
| 19 | Muskegon Heights | November 1999–June 2000 | Indict. at ¶ 120 |

3

| 20 | W.E.B. DuBois | November 1999–July 2001 | Indict. at ¶ 128 |
|---|---|---|---|
| 21 | Fifteen projects | October 2002–January 2004 | Indict. at ¶ 138 |

In Count 22, defendant was charged with conspiracy to commit fraud in violation of 18 U.S.C. 371. She and others agreed to obtain E-Rate funding on the basis of false representations to USAC during the bidding, application, and implementation of E-Rate projects for 2003–2004.

Trial commenced on August 13, 2007. At the conclusion of the government's case, the defense moved for a judgment of acquittal pursuant to FRCrP 29. The Court reserved ruling until after the verdict. On September 14, 2007, the jury returned a guilty verdict on all twenty-two counts.

**ANALYSIS**

**1.    MOTION FOR A JUDGMENT OF ACQUITTAL.**

In making a ruling under FRCrP 29, "[t]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Alarcon-Simi*, 300 F.3d 1172, 1176 (9th Cir. 2002) (internal citation omitted). "[A] district court must bear in mind that it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts." *Ibid* (citation omitted in original). "Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction." *United States v. Reyes-Alvarado*, 963 F.2d 1184, 1188 (9th Cir. 1992).

**A.    Did the Government Prove that the Charged Wirings Were Made in Furtherance Of Fraud?**

The defense argues that the government failed to prove that the charged wirings were made in furtherance of the frauds charged in Counts One Through Eleven. Wire fraud has three elements: (i) a scheme to defraud; (ii) use of the wires in furtherance of the scheme; and (iii) a specific intent to deceive or defraud. *See* 18 U.S.C. 1343; *United States v. Garlick*, 240 F.3d 789, 792 (9th Cir. 2001). "In general, to be in furtherance of a scheme, the charged

4

mailing or wire transmission need not be an essential element of the scheme, just a 'step in the plot.'" *Id.* at 795 (citation omitted). The mailing must be "incident to an essential part of the scheme." *Pereira v. United States*, 347 U.S. 1, 8 (1954).

The defense claims that the charged wirings were too far removed from defendant's scheme. The alleged schemes to defraud involved defendant's submission of materially false Form 471s and submission of other materially false information during a subsequent review process. The Form 471s were filed in January 2000 and the reviews occurred in early to mid-2000. USAC issued funding decisions later in 2000. The defense argues that the wirings in question could not be in furtherance of the scheme to defraud because they occurred a year-and-a-half later. The scheme to defraud, therefore was essentially over by the time of the wirings, which were "simply too attenuated" to support the frauds charged, or so it is argued (Def. Br. at 10).

The Ninth Circuit has held that "the issue is not one purely of time sequence. '[S]ubsequent mailing can in some circumstances provide the basis for an indictment under the mail fraud statutes.'" *United States v. Lo*, 231 F.3d 471, 478 (9th Cir. 2000).[1] Rather, the appropriate question is to ask whether the wiring was "part of the execution of the scheme as conceived by the perpetrator at the time." *Ibid*. The mere fact that a wiring occurred a year or a year-and-a-half later did not render the wiring too attenuated to be a part of the fraudulent scheme. The proper analysis would be to ask whether the wiring was a "step in the plot" or "incident to an essential part of the scheme."

The defense argues that the evidence did not support the government's contention that the scheme was ongoing because defendant had not yet been paid. There was never any evidence, defendant claims, about when and how much the schemes were paid (except for the Luther Burbank School District). This argument is without merit. The scheme was complicated and had various facets, which included *but was not limited to* actually obtaining the USAC funds. Ensuring that the requested equipment was installed at the schools was a

---

[1] "It is well settled that cases construing the mail fraud and wire fraud statutes are applicable to either." *United States v. Shipsey*, 363 F.3d 962, 972 n. 10 (9th Cir. 2004).

5

necessary aspect of the ongoing scheme. The wirings were related to that aspect of the ongoing scheme, *i.e.*, to the real-world construction work to carry out the project. We must remember that this real-world construction included installation of not only eligible equipment but also *ineligible* equipment (but disguised as eligible in the paperwork). The fraud was complete when the ineligible equipment and services were done and the schemers were "entitled" to obtain final payment and/or to keep monies already advanced.

Defendant then claims that, instead of providing sufficient evidence for each wire fraud count, the government "argued all of the fraud charges as if it had charged one single fraud, or one single conspiracy to defraud" (Def. Br. 13). Specifically, defendant claims, the evidence for Counts Three, Four, Five, Six, Seven, Nine, and Eleven were problematic. For Count Three, defendant alleges that the email sent on March 19, 2001, from Brian Boyce, an NEC employee in Cincinnati, Ohio, was admitted for the limited purpose of showing that the wiring was made. The contents of the email, therefore, could not be considered for their truth. But the contents could certainly be considered to establish that the information was sent (whether true or not), which was entirely sufficient for the wire fraud. Moreover, witness John Colvin testified that the email had been sent by a group responsible for implementing the equipment in school districts. He corroborated the substance of the email, discussing that ineligible VNCI video equipment was purchased and installed for the Covert School District (Tr. 1955–58). The government then introduced Exhibit 271, a document representing a bill from VNCI to NEC for service fees. Part of defendant's compensation was based on these fees. The document was dated March 27, 2001, and it showed that, at least eight days after the wiring in question was sent, the benefits of the scheme had not yet been fully distributed to co-conspirators (*id.* at 1989–91). This evidence supported the individual wire fraud count.

Defendant then argues that the email in Count Four, which was dated February 22, 2001, was not part of the scheme as it only discussed how much fiber, data, and switches should be installed. Witness Colvin, however, testified that the email addressed how the total amount of cabling would affect "in kind" dollars and services. The issue was resolved when a smaller amount of cabling was later provided, indicating how expenditures of USAC funds on ineligible

6

1   items changed through time (*id.* at 1976–78). Again, this wiring was dated well before the time
2   defendant and co-conspirators were entitled to the grant, the prize of this fraudulent scheme.
3   For Counts Five, Six, Seven, Nine, and Eleven, defendant makes the same argument that the
4   emails were admitted for a limited purpose and did not constitute evidence of a wiring in
5   furtherance of fraud. This argument is rejected for the same reasons stated. Finally, defendant
6   did not have to be a named recipient on these emails and faxes in order for them to be a "step in
7   the plot." *See Schmuck v. United States*, 489 U.S. 705 (1989).

8         In all eleven counts, there were interstate emails or faxes discussing co-pays and/or
9   ineligible equipment. The fraud was ongoing until each of the schemers "earned" their
10  expected benefit from the scheme. The wirings were innocent enough in themselves (the law
11  does not require them to be false) but the wirings were incident to the essential step of actual
12  installation of the ineligible equipment, not to mention the sham co-pay arrangements. Viewing
13  the evidence in the light most favorable to the prosecution, this order finds that a reasonable
14  jury could have found that the charged wirings were made in furtherance of the frauds.

15        **B.   Did the Government Prove there was an Agreement
             Between Horizontal Competitors
16           In Counts Twelve through Twenty?**

17        Defendant argues that judgment of acquittal should be entered on Counts Twelve
18  through Twenty, the antitrust counts, because the government failed to prove that there was an
19  agreement between horizontal competitors. She cites *United States v. Sargent Electric Co.*,
20  785 F.2d 1123, 1127 (3d Cir. 1986), for the proposition that an agreement to fix prices is an
21  "empty threat" if it were not between actual or potential competitors. The only common
22  co-conspirator was VNCI, but VNCI was not a horizontal competitor of Intertel, NEC, or
23  Premio, she argues. While VNCI was a manufacturer that did not normally bid on E-Rate
24  projects, the other companies were integrators, who used the manufactured product when
25  bidding on and installing video equipment for customers (Def. Br. at 16–17).

26        The Ninth Circuit has held that, in a prosecution for price fixing in violation of the
27  Sherman Act, the district court properly instructed the jury that defendants were competitors if
28  they were individuals providing the same service to customers. *United States v. A. Lanoy*

7

*Alston*, 974 F.2d 1206, 1210 (9th Cir. 1992). The First Circuit has noted that a potential competitor must have the "necessary desire, intent, and capability to enter the market" at the level of the other competitor. *Engine Specialties, Inc. v. Bombardier Ltd.*, 605 F.2d 1, 9 (1st Cir. 1979). The main question here is whether a reasonable jury could have found that companies involved provided the same service to customers.

This order agrees with the government that, even though a company had no previous experience dealing with a particular product, it could still be a competitor for the prime-contractor job. For example, in Count Twelve, for the West Fresno project, Howe Electric had no experience selling, installing or overseeing the implementation of the desired equipment. Nonetheless, Howe Electric was awarded the prime-contractor position (Tr. 1181, 1205). Moreover, even if a company did not have the financial ability to perform the contracts, the contract could still be awarded to that company. Sema4, for example, was a company that was barely financially viable. Yet, it was awarded E-Rate funding in 2001 for the Luther Burbank project (*id.* at 795, 872). So, although a company did not have prior experience dealing with a particular product or was not financially viable, it could still be a competitor for the prime-contractor job.

In Counts Twelve through Nineteen, the government contended that VNCI, Inter-Tel, Premio, NEC, and/or Howe Electric were horizontal competitors because they all provided prime contractor services. For the West Fresno project in Count Twelve, Inter-Tel and Premio agreed to refrain from bidding against Howe Electric, which bid on and was chosen to be the prime contractor for the job. Inter-Tel and Premio then submitted subcontractor bids to Howe Electric. Defendant had arranged for and imposed these conditions on the vendors (*id*. at 744–46, 1181–88, 1701–07).

It does not matter that the school district superintendent had supposedly already favored Howe Electric. That the superintendent evidently intended to violate the procurement laws did not authorize the prospective bidders to rig their own bids. They should have bid independently without prearrangement. The superintendent might then be forced to choose the best bid.

8

But even if not and the superintendent chose Howe Electric, then at least there would have been true competition for the project, as required by the Sherman Act.

For the Highland Park project in Count Thirteen, Premio, Inter-Tel, and VNCI provided the same services to customers at one time or another during the two years of the project. In 1999, defendant directed Premio to manage existing vendors already involved in the project. Premio agreed to subcontract portions of the job to VNCI (*id.* at 705–06, 730–31). Then in 2000, VNCI was the prime contractor that subcontracted some parts of the project to Premio (*id.* at 737–38). Similarly, at one point Inter-Tel was awarded funds to provide data equipment to the school (some of that equipment being VNCI products), and the next year, VNCI was awarded those funds to also provide data equipment. Defendant oversaw these arrangements (*id*. at 2290, 2300–11). Because they could provide the services and equipment requested by school districts, all of these companies were horizontal competitors, or so the jury could reasonably have found.

For Counts Fourteen through Nineteen, VNCI and NEC were alleged to be horizontal competitors in providing the E-Rate prime-contractor service. NEC was the prime contractor in these projects. It received E-Rate funds and provided services to the schools, with the help of subcontractors (*id*. at 1870, 1898, 1914–15, 2077, 2319–23). NEC received millions of dollars in E-Rate funds (*id.* at 1945–52). VNCI had also been a prime contractor during the Highland Park project in 2000 (as described in Count Thirteen), and VNCI delegated certain portions of the project to subcontractors (*id.* at 737, 1067–69, 2312–13). For this project, VNCI received about six-and-a-half million dollars in E-Rate funds (*id.* at 1067–68). VNCI and NEC obtained projects similar in scope and funds committed and were therefore horizontal competitors.

This order finds that, when viewing the evidence in the light most favorable to the prosecution, a reasonable jury could have found that VNCI, Inter-tel, NEC, and/or Premio had the ability to contract with others to provide the desired services and be horizontal competitors. Defendant communicated with vendors when to bid or not bid and who should be awarded a prime contractor or subcontractor role, and the vendors followed the arrangement. There was sufficient evidence of an agreement between horizontal competitors.

9

### C. Did the Evidence Show that the School District Wanted Howe Electric to be the Prime Contractor In Count Twelve?

Defense counsel reiterates its earlier argument that the evidence shows that it was school district (*i.e.*, the West Fresno superintendent) who wanted the job to go to Howe Electric. A purchaser, defendant argues, is free to not pursue competitive bidding. The Court, however, has already denied the Rule 29 motion with respect to this issue, granting leave to defendant to renew the motion with additional points and authorities (Tr. 2605–13). No additional points and authorities have been forthcoming, so the Court adopts its earlier ruling. For the reasons stated, the jury could reasonably have found that defendant was a co-conspirator.

### D. Did the Statute of Limitations Expire For the Antitrust Offenses Charged In Counts Twelve Through Twenty?

Defendant alleges that the statute of limitations had lapsed for the Sherman Act offenses charged in Counts Twelve through Twenty. According to 18 U.S.C. 3282, "[e]xcept as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed." The defense argues that the bidding procedures were completed and the fraudulent forms were submitted by mid-January 2000. The government filed its first indictment on April 7, 2005, more than five years later.[2] The offenses are therefore time-barred, it is argued.

The Ninth Circuit has explicitly held that a conspiracy will continue as long as its members continue to commit acts in furtherance of the agreement that tend to suppress or restrain competition. "While a Sherman Act conspiracy is technically ripe when the agreement to restrain competition is formed, it remains actionable until its purpose has been achieved or abandoned, and the statute of limitations does not run so long as the co-conspirators engage in

---

[2] The original indictment was returned on April 7, 2006, and the superseding indictment was returned on December 8, 2006. "Once an indictment is returned the statute of limitations is tolled as to the charges contained in the indictment. A superseding indictment returned while the first indictment is pending is timely 'unless it broaden[s] or substantially amend[s]' the charges in the original indictment." *United States v. Sears, Roebuck & Co., Inc.*, 785 F.2d 777, 778–79 (9th Cir. 1986) (citations omitted). Here, the Sherman Act counts remained the same in both indictments. The five-year statute of limitations for the Sherman Act counts therefore runs from April 7, 2000.

10

overt acts designed to accomplish its objectives." *United States v. Inryco, Inc.*, 642 F.2d 290, 293 (9th Cir. 1981).

Defendant tries to distinguish *Inryco* from the facts in this case. She states that in *Inryco*, the Ninth Circuit did not want to dismiss the charge as time-barred at the pleading stage. The indictment in *Inryco*, which was filed in January 1980, sufficiently alleged that the conspiracy continued until December 1975. Here, the issue is not about the sufficiency of the indictment; the issue is whether or not the government presented sufficient proof at trial to show that the conspiracies in fact continued into April 2000. Defendant claims there was no such proof.

This order disagrees. The duration of a conspiracy for purposes of the statute of limitations is a fact question for the jury. *United States v. Walker*, 653 F.2d 1343, 1346 n.6 (9th Cir. 1981). In *Walker*, "a jury could have concluded that one aim of the agreement was for [defendant] to repay each co-conspirator who agreed not to bid or to bid only the minimum, and, that being an aim of the conspiracy, that it lasted through the division of the excess profits [defendant] made on the sale among the co-conspirators." *Ibid*. A reasonable jury, therefore, could have found that the conspiracy here lasted until the co-conspirators' receipt of USAC funds. The government presented various exhibits detailing the receipt and disbursal of money, all of which occurred after April 7, 2000. For example, VNCI sent NEC a "bill" dated March 27, 2001, listing what VNCI believed it was owed for the marketing-and-management fees related to various school projects (Tr. 1989–90, 2324, Exh. 271). The government presented emails and documents sent after April 7, 2000, for Counts Twelve through Twenty. This order finds that a reasonable jury could have found that the limitations period had not expired by the time the government filed its first indictment. (The jury was properly instructed on the statutes of limitations and no contention is made to the contrary.)

### E. Did the Government Prove there was a Conspiracy To Commit Fraud in Count Twenty-Two?

Count Twenty-Two charged defendant with conspiracy to commit fraud in violation of 18 U.S.C. 371. "The essential elements of a conspiracy are (1) an agreement to engage in criminal activity, (2) one or more overt acts taken to implement the agreement, and

11

(3) the requisite intent to commit the substantive crime." *United States v. Nelson*, 66 F.3d 1036, 1044 (9th Cir. 1995) (citation omitted). To support its claim that a judgment of acquittal should be entered on this count, defendant argues that there was no evidence that there was an agreement to commit fraud.

Witness Richard Favara created American Education Alliance. He agreed with defendant to use the Alliance to provide schools' co-pay (instead of the schools paying the co-pay themselves). Because Alliance had no funds, the funds obtained from the E-Rate program for his other company (Expedition Networks), of which he was president, would be used to fund the Alliance, and eventually, the schools' co-pay. Witness Favara, however, never stated that he agreed to grant any schools money, nor did he authorize sending false Alliance financial information to USAC (Tr. 2376–83). The defense concludes that the government failed to prove the charged conspiracy because Witness Favara, the only witness to testify on these issues, never agreed with defendant "to provide false information and bogus grants to the school districts or to USAC." He only agreed to use funds from Expedition Networks so that Alliance could pay schools' co-pay (Def. Br. at 22).

This order disagrees with defendant's reasoning. To satisfy the agreement element of 18 U.S.C. 371, "[t]he agreement need not be explicit; it is sufficient if the conspirators knew or had reason to know of the scope of the conspiracy and that their own benefits depended on the success of the venture." *United States v. Montgomery*, 384 F.3d 1050, 1062 (9th Cir. 2004). Furthermore, "[a] formal agreement is not necessary; an agreement may be inferred from the [defendant's] acts pursuant to the scheme, or other circumstantial evidence." *United States v. Hopper*, 177 F.3d 824, 829 (9th Cir. 1999).

It did not matter if Witness Favara did not explicitly or formally agree to every action taken by defendant — *e.g.*, sending false Alliance financial information to USAC. It was sufficient if he and defendant knew or had reason to know of the scope of the conspiracy and their own benefits depended on the success of the venture. Here, defendant agreed with Witness Favara that she would direct E-Rate projects to Expedition Networks in return for five to ten percent of any E-Rate funding Witness Favara received. Defendant used Alliance to give

12

USAC the false impression that the schools had enough resources to pay for their co-pays. Alliance had no assets, so Witness Favara's Expedition Networks paid some of the E-Rate funds it received to Alliance, Alliance "donated" the funds to the school, and the school "paid" the funds to Expedition Networks as its co-pay. Defendant provided Witness Favara with false financial information about Alliance's assets, which, after some hesitation, Witness Favara posted on Alliance's website (Tr. 2366–80). When asked why he was willing to put inaccurate information on the Alliance website, Witness Favara stated, "I guess it was — the biggest factor in all of it was that we were so far down the road in trying to close a few of these so that we could breathe financially, that stretching that piece, I thought, well, if that will help get this thing finally finished for Expedition that we get a few of these things closed, let's get it done" (*id.* at 2376). The scheme was to use Alliance to make a "grant" to the school to cover its co-pay. The grant was worthless since Alliance was broke. This was a fiction used to deceive USAC into thinking the school was going to cover its own co-pay. As long as Witness Favara and others agreed to this goal, it was not necessary for the government to show that every co-conspirator explicitly agreed to every means of reaching that goal. Viewing this evidence in the light most favorable to the prosecution, a reasonable jury could have found that there was an agreement to commit fraud.

### 2. MOTION FOR NEW TRIAL.

Under FRCrP 33, a trial judge may vacate a judgment and grant a new trial if the interest of justice so requires. The decision to grant a new trial lies within the trial judge's discretion. *United States v. Rush*, 749 F.2d 1369, 1371 (9th Cir. 1984). The trial judge does not need to "view the evidence in the light most favorable to the verdict; it may weigh the evidence and evaluate for itself the credibility of the witnesses." *United States v. Kellington*, 217 F.3d 1084, 1097 (9th Cir. 2000). Nonetheless, a motion for new trial should be granted only in those exceptional circumstances in which the evidence preponderates heavily against the verdict. *United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981).

In the event that a judgment of acquittal is not entered, defendant requests a new trial pursuant to FRCrP 33. The defense does not provide any other justification for a new trial other

13

1  than it would be "in the interests of justice so that the deficiencies outlined above can be
2  thoroughly litigated" (Def. Br. at 23).  A new trial should be granted, however, only in
3  exceptional circumstances.  This order finds that there were no such exceptional circumstances
4  in which the evidence preponderated heavily against the verdict.  Nor did defense counsel
5  provide evidence to support a finding of exceptional circumstances.

6  Ample evidence supported the verdict against defendant.  Numerous witnesses, some of
7  whom were her co-conspirators, testified to defendant's fraudulent scheme.  They testified how
8  defendant determined and organized the course of the E-Rate scheme (Tr. 995–6, 1478–80,
9  1580–86).  To accomplish this scheme, a sham bidding process was conducted so that vendors
10 were wrongfully selected on the basis of their relationship with defendant (*id.* at 826–7,
11 1807–10).  False summaries of the bidding process masked the fraud (*id.* at 2441–43).
12 The forms and contracts were submitted to USAC, omitting the fact that ineligible end user and
13 video equipment would be purchased with E-Rate funds — prices of eligible products had been
14 inflated to enable vendors to pay for the ineligible items (*id.* at 1708–20, 1983–87).
15 Defendant then received in kickbacks in a percentage of the work she steered to the various
16 "bidding" companies (*id.* at 1738–49, 1990–91).  The USAC submissions fabricated budgets to
17 show that the schools could pay their co-pays, when no such co-pay was ever contemplated by
18 schools or vendors (*id.* at 1493–94, 1597–99).  Defendant also used false documents to claim
19 that the non-profit entity Alliance, which actually had no assets, would fund the co-pays (*id.* at
20 2373–90).  These schemes were corroborated by documents, emails, and defendant's
21 admissions at trial.  This order finds that, rather than preponderate heavily against the verdict,
22 the evidence weighed heavily *in favor* of the verdict.

# CONCLUSION

For the foregoing reasons, defendant's motions for a judgment of acquittal and for a new trial are **DENIED**.

**IT IS SO ORDERED.**

Dated: November 7, 2007.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE