1  MICHAEL F. WOOD (DCBN 376312)
   RICHARD B. COHEN (CSBN 79601)
2  BRIAN J. STACK (OSBN 0069796)
   JASON M. KATZ (OSBN 0076104)
3  ALBERT SAMBAT (CSBN 236472)
   ANNA TRYON PLETCHER (CSBN 239730)
4  Antitrust Division
   U.S. Department of Justice
5  450 Golden Gate Avenue
   Box 36046, Room 10-0101
6  San Francisco, California 94102
   Telephone (415) 436-6660
7  Attorneys for the United States of America

8

                    UNITED STATES DISTRICT COURT
9
                  NORTHERN DISTRICT OF CALIFORNIA
10
                       SAN FRANCISCO DIVISION
11

12  UNITED STATES OF AMERICA,           )   No. CR-05-0208-07 WHA
                                        )
13                        Plaintiff,    )   **UNITED STATES' SENTENCING**
                                        )   **MEMORANDUM**
14            v.                        )
                                        )
15                                      )   Hearing Date: March 19, 2008
                                        )
16  JUDY GREEN,                         )   Time: 9:30 a.m.
                                        )
17                        Defendant.    )   Court: Hon. William H. Alsup
                                        )
18  ──────────────────────────────────

19

20

21

22

23

24

25

26

27

28

**UNITED STATES' SENTENCING MEMORANDUM**
**CR-05-0208-07 WHA**

1

# **TABLE OF CONTENTS**

2

3    I.    BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

4          A.    The E-Rate Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

5          B.    The Offense Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

6                1.    Bid Rigging . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

7                2.    Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

8

9    II.   GUIDELINES CALCULATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

10         A.    *Ex Post Facto* Considerations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

11         B.    Grouping the Antitrust and Fraud Counts . . . . . . . . . . . . . . . . . . . . . . . 7

12         C.    Base Offense Level . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

13         D.    Enhancements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

14               1.    Standard of Proof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

15               2.    Role in the Offense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

16                     a.    Leader/Organizer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

17                     b.    Five or More Participants . . . . . . . . . . . . . . . . . . . . . . . . 10

18                     c.    Otherwise Extensive . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

19               3.    Sophisticated Means . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

20                     a.    Fictitious Entities, Corporate Shells . . . . . . . . . . . . . . . . 13

21                     b.    Complexity of the Schemes . . . . . . . . . . . . . . . . . . . . . . . 14

22               4.    Abuse of Position of Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

23                     a.    USAC Placed Applicants in a Position of Trust . . . . . . . . . . . . 16

24                     b.    Relevant Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

25               5.    Obstruction of Justice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

26                     a.    Luther Burbank (Count 11) . . . . . . . . . . . . . . . . . . . . . . . 20

27                     b.    Source of Funds for Value-Adds (Counts 1-11) . . . . . . . . . . . . 22

28                     c.    Year Six Collusion (Count 22) . . . . . . . . . . . . . . . . . . . . . 24

**UNITED STATES' SENTENCING MEMORANDUM**
**CR-05-0208-07 WHA**              i

            d.      Forged Signature (Count 21) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

   E.      Loss Calculation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

        1.      Co-pay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

            a.      Counts 1-7, 10, 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

            b.      Count 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

            c.      Count 22 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

        2.      Ineligible Video Equipment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

        3.      Ineligible End-User Equipment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

        4.      Ineligible Consulting Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

        5.      Total Loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

   F.      Combined Offense Level . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

III.     SECTION 3553 ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

   A.      Nature and Circumstances of the Offense . . . . . . . . . . . . . . . . . . . . . . . . . . 42

   B.      History and Characteristics of the Defendant . . . . . . . . . . . . . . . . . . . . . . . 44

   C.      Seriousness of the Offense, Respect for the Law and Just Punishment . . . . . . . . 45

        1.      Seriousness of the Offense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

        2.      Respect for the Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

        3.      Just Punishment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

   D.      Provide Deterrence to Criminal Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

   E.      Protect the Public from Further Crimes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

   F.      Need to Avoid Unwarranted Sentence Disparities . . . . . . . . . . . . . . . . . . . . 49

   G.      Sentencing Guidelines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

IV.     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

**UNITED STATES' SENTENCING MEMORANDUM**
**CR-05-0208-07 WHA**             ii

1

## <u>TABLE OF AUTHORITIES</u>

2

**FEDERAL CASES**

3  *Gall v. United States*, __ U.S. __, 128 S.Ct. 586 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 42, 50

4  *Kimborough v. United States*, __ U.S. __, 128 S.Ct. 558 (2007) . . . . . . . . . . . . . . . . . . . . . . . 5

5  *United States v. Adame*, 06-CR-1082 (S.D. Tex., Feb. 9, 2007) . . . . . . . . . . . . . . . . . . . . . . . 49

6  *United States v. Barnes*, 993 F.2d 680 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

7  *United States v. Bokhari*, 04-CR-56 (E.D. Wisc., Jan. 28, 2005, Apr. 5, 2005) . . . . . . . . . . . . 50

8  *United States v. Calozza*, 125 F.3d 687 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

9  *United States v. Cartier*, 2007 WL 2712939 (D.N.D., Sept. 14, 2007) . . . . . . . . . . . . . . . . . . . 40

10  *United States v. Christiansen*, 958 F.2d 285 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

11  *United States v. Colello*, 16 F.3d 193 (7th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

12  *United States v. Dunnigan*, 507 U.S. 87 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

13  *United States v. Duran*, 15 F.3d 131 (9th Cir 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

14  *United States v. Egge*, 223 F.3d 1128 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

15  *United States v. Fletcher*, 50 Fed.Appx. 379 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 15

16  *United States v. Haggard*, 41 F.3d 1320 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

17  *United States v. Hill*, 915 F.2d 502 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

18  *United States v. Hiralal*, 44 Fed.Appx. 176 (unpublished) (9th Cir. 2002) . . . . . . . . . . . . . . . . 10

19  *United States v. Howard*, 894 F.2d 1085 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

20  *United States v. Jimenez-Ortega*, 472 F.3d 1102 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . 20

21  *United States v. Johnson*, 1999 WL 395381 (N.D.N.Y., June 4, 1999) . . . . . . . . . . . . . . . . . . 40

22  *United States v. Jordan*, 256 F.3d 922 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

23  *United States v. Kohl*, 972 F.2d 294 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

24  *United States v. Little*, 230 Fed.Appx. 701 (9th Cir. 2007) (unpublished) . . . . . . . . . . . . . . . . 15

25  *United States v. Ortland*, 109 F.3d 539 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 38-41

26  *United States v. Rose*, 20 F.3d 367 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

27  *United States v. Scarano*, 975 F.2d 580 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

28  *United States v. Sherwood*, 98 F.3d 402 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**UNITED STATES' SENTENCING MEMORANDUM**
**CR-05-0208-07 WHA**                                 iii

*United States v. Staten*, 466 F.3d 708 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Tulaner*, ___ F.3d ___, 2008 WL 80703 (9th Cir. 2008) . . . . . . . . . . . . . . . . . 28

*United States v. Zolp*, 479 F.3d 715 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

**FEDERAL STATUTES**

15 U.S.C. § 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 371 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 1343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 3553 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 5, 42, 50, 51

47 C.F.R. § 54.500 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

47 C.F.R. § 54.504 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

47 C.F.R. § 54.505 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

U.S.S.G. § 1B1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

U.S.S.G. § 1B1.11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 39

U.S.S.G. § 1B1.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18, 19

U.S.S.G. § 2B1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 13, 28-30, 39, 47

U.S.S.G. § 2F1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 13, 38-41

U.S.S.G. § 2R.1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

U.S.S.G. § 3B1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-12, 40, 41

U.S.S.G. § 3B1.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 15, 16, 40, 41

U.S.S.G. § 3C1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 20

U.S.S.G. § 3D1.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 40

U.S.S.G. § 3D1.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

U.S.S.G. § 3D1.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 41

**MISCELLANEOUS**

12 FCC Rcd. 8776, 9035 (May 8, 1997) ("1997 FCC Order") . . . . . . . . . . . . . . . . . . . . . . . 30, 31

**UNITED STATES' SENTENCING MEMORANDUM**
**CR-05-0208-07 WHA**            iv

1    Pursuant to Federal Rule of Criminal Procedure 32 and Criminal Local Rule 32-5, the

2    United States respectfully submits this Sentencing Memorandum.

3    For the reasons set forth herein, the United States, applying the relevant United States

4    Sentencing Guidelines (U.S.S.G. or "Guidelines"), calculates an offense level of 38. This level

5    results in a range of 235 to 293 months incarceration. After consideration of the factors set forth

6    in 18 U.S.C. § 3553, the government recommends a sentence within this Guidelines range.

## I.    BACKGROUND

On September 14, 2007, a federal jury convicted Judy Green of eleven counts of wire

fraud in violation of 18 U.S.C. § 1343, ten counts of bid rigging in violation of 15 U.S.C. § 1,

and one count of conspiracy to commit wire fraud, 18 U.S.C. § 371. The fraud and collusion,

which occurred over a seven-year period, centered on technology projects funded or requested to

be funded by the Federal Communications Commission's ("FCC") E-Rate program. The

following summarizes the evidence presented at trial.

### A.    The E-Rate Program

In 1996, Congress passed the Telecommunications Act, which required the FCC to

collect money from telecommunication users and spend that money on a program, known as E-

Rate, to foster connectivity between certain types of entities—schools, libraries, and rural health

facilities—and the Internet. Under this mandate, the FCC gathers and distributes over $2 billion

a year from telecommunication users. Despite this large sum, each year the application requests

far outnumber the funds available.

Following the direction of Congress, the FCC hired the Universal Service Administrative

Corporation ("USAC"), a not-for-profit corporation, to administer the E-Rate program. The FCC

established the fundamental precepts that would govern the E-Rate program, and USAC

established the criteria for administering the FCC's rules. The fundamental rules of the program

included: subsidizing the cost of various technology projects up to a maximum of 90 percent

(requiring the applicant to make a "co-pay" of the remaining amount); restricting the goods and

services eligible for reimbursement; and requiring applicants to use a competitive bidding

process to secure the lowest cost, most responsive bids for the proposed projects. In general, the

**UNITED STATES' SENTENCING MEMORANDUM**
**CR-05-0208-07 WHA**          1

list of "eligible" goods and services comprised technology products that were "up to the wall," such as cabling or servers, while end-user equipment, such as computers, printers, or monitors, was ineligible.

### B.     The Offense Conduct

Defendant Green marketed herself to schools as a "consultant" who could secure E-Rate funds for technology projects.  She claimed experience with and expertise in the E-Rate program and was willing to handle the entire application and implementation processes for the schools. She promised school officials that her vendors would provide other goods and services, such as ineligible end-user equipment, without cost to the school.  She also promised the school officials that their schools would not have to pay their co-pays.  Many schools accepted her offer, and thereafter, Defendant and her coconspirators usually controlled all aspects of the E-Rate process at those schools: initial registration with USAC, design of the technology plans, creation and submission of the schools' applications, and supervision of the vendors.  In this manner, described in more detail below, Defendant and her coconspirators were able to mislead USAC and the FCC into funding entire projects and paying for goods, services, and fees ineligible for reimbursement.

### 1.     Bid Rigging

Defendant Green used her school-consulting relationship as a marketing tool with various companies interested in becoming E-Rate vendors.  She represented to these companies that, because of her "consultant" relationships with the schools and her expertise with E-Rate, she had the power to make cooperating companies the winning vendors for the E-Rate contracts.  Green and the vendors signed formal "marketing and management" agreements or sometimes created more informal agreements to pursue the placement of these companies as the winning vendors at the schools where Defendant was a "consultant."

Unbeknownst to the schools or USAC, the vendors paid either VNCI or ADJ Consultants (companies that employed Defendant) approximately ten percent of each project's value, a fee that the government considers the *quid pro quo* for the vendors' selection and a fee that was not

**UNITED STATES' SENTENCING MEMORANDUM**
**CR-05-0208-07 WHA**                    2

1   reimbursable under the E-Rate rules.[1]  In addition to this fee, the cooperating vendors agreed not

2   to compete with each other; instead, they accepted assignments as prime contractor or

3   subcontractor, as directed by Defendant.  At Defendant's insistence, the vendors also agreed not

4   to collect the schools' co-payments and to provide, at no cost to the schools, ineligible end-user

5   equipment, such as computers, monitors, printers, and telephones.

6          In order to ensure that her coconspirators secured the contracts, Defendant orchestrated a

7   sham bidding process that virtually eliminated any independent vendors.  She created a complex,

8   incomprehensible Request for Proposal ("RFP") to discourage independent vendors from

9   bidding, and she disqualified those bids that were received from independent vendors.  In

10  addition, she massaged the favored vendors' bids, both before submission to the school and after,

11  to ensure that they would pass reviewing agency scrutiny, yet still provide significant profits.

12  Often Defendant handled the entire bid-evaluation process.  In almost every case, the winning

13  bidder was a vendor that had agreed to the terms of the relationship described above.  And in

14  almost every case, the winning vendor kicked back or committed to kick back a fee to either

15  VNCI or ADJ Consultants.

16         In sum, Defendant functioned as an intermediary between prospective competing vendors

17  in a "hub-and-spoke" bid-rigging conspiracy.  She was at the center of the conspiracies, acting to

18  coordinate the vendors' bids, and she was the key decision-maker as to which vendor would

19  receive which portion of the projects.  Each coconspirator vendor had the ability to serve as

20  prime contractor or subcontractor on the projects.  The role of the prime contractor was

21  essentially that of a project manager; if a prime contractor could not provide a service in-house, it

22  could, and did, subcontract it out.  Evidence at trial demonstrated that vendors with virtually no

23  financial wherewithal or production capabilities were awarded contracts valued at over a million

24  dollars.  Vendors' product lines, track records, and financial strength were not factors in their

25

26  ───────────────

27         [1] Not all vendors paid this fee.  Some vendors, such as Premio, never agreed to pay it,
    while others, despite agreeing, never actually paid.  Howe Electric was never asked to pay, but
28  agreed to use subcontractors who did agree to pay Defendant.

**UNITED STATES' SENTENCING MEMORANDUM**
**CR-05-0208-07 WHA**                  3

1   ability to compete for bids; the key to success was their connection to Defendant and their

2   willingness to abide by her rules.

3           **2.**     **Fraud**

4        Free from the constraints of competition, Defendant Green instructed the coconspirator

5   vendors to inflate the prices that they charged the government for eligible goods and services in

6   order to cover the costs of ineligible goods and services, including the management fee kickback,

7   and to enable them to complete the entire project without collecting a co-pay.   In order to justify

8   these artificially high prices, Defendant made misrepresentations and falsified information

9   submitted to USAC.  Specifically, she misrepresented that (1) the schools were applying for

10  funds to pay only for eligible goods and services, when, in fact, Defendant and her coconspirators

11  intended to supply ineligible goods and services, the cost of which was hidden in the cost of the

12  eligible goods and services; and (2) the schools had budgeted funds to meet the required co-

13  payment, when, in fact, no such budget allocation had been made because such funds were either

14  unavailable or not intended to be spent on E-Rate.  Defendant and her coconspirators made these

15  misrepresentations primarily on the FCC's standard application form, the "Form 471," and in

16  responses to follow-up questions that USAC had about the applications.

17       Relying on this misinformation, USAC and the FCC funded most of the projects.  Instead

18  of providing eligible goods and services and collecting the co-pay as indicated on the

19  submissions to USAC, the vendors delivered ineligible items—end-user equipment such as

20  computers, monitors, and desks, and other ineligible items, such as air conditioning equipment,

21  roofs, and even a television studio.  The vendors also used E-Rate money to purchase and install

22  ineligible video equipment from Defendant's employer, VNCI.  Finally, they spent E-Rate funds

23  on Green's "marketing fees" and, in waiving the co-pay, used E-Rate money to pay for 100

24  percent of the cost of the project.  Defendant knew that if USAC had been aware of how its

25  money was being spent, it would have denied or significantly reduced funding for the projects.

26  These four categories of fraud – ineligible end-user equipment, ineligible video equipment,

27  marketing and management fees, and co-pay –  charged in the Indictment and proven at trial,

28  form the basis for the government's loss calculations, explained in more detail below.

**UNITED STATES' SENTENCING MEMORANDUM**
**CR-05-0208-07 WHA**          4

## II.    GUIDELINES CALCULATION

The Supreme Court recently set out the procedures a court must follow at sentencing.  A court should begin by correctly calculating the applicable United States Sentencing Guidelines range.  *Gall v. United States*, __ U.S. __, 128 S.Ct. 586, 596 (2007) ("the Guidelines should be the starting point and the initial benchmark").  Although the Guidelines are advisory, the court must "begin [its] analysis with the Guidelines and remain cognizant of them throughout the sentencing process."  *Id.* at 597, 596 n.6 (the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions").

After calculating the Guidelines range and giving both parties an opportunity to argue for whatever sentence they deem appropriate, a court should "consider all of the §3553(a) factors to determine whether they support the sentence requested by a party."  *Gall*, 128 S.Ct. at 596; *Kimborough v. United States*, __ U.S. __, 128 S.Ct. 558, 570 (2007).  The Guidelines calculation ordinarily "will reflect a rough approximation of sentences that might achieve 3553(a)'s objectives."  *Kimborough*, 128 S.Ct. at 574 (internal punctuation and citation omitted).  Thus, "a district judge must give serious consideration to the extent of any departure from the Guidelines and must explain his conclusion that an unusually lenient or an unusually harsh sentence is appropriate in a particular case with sufficient justifications."  *Gall*, 128 S.Ct. at 594.  Once a court settles on an appropriate sentence, it "must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing."  *Id.* at 597.

### A.    *Ex Post Facto* Considerations

U.S.S.G. § 1B1.11(a) sets forth a "one book rule" in which it directs sentencing courts to "use the Guidelines Manual in effect on the date that the defendant is sentenced."  Section 1B1.11(b), however, requires that courts use the Guidelines Manual in effect on the date the offense of conviction was committed if use of the current Guidelines would violate the *ex post facto* clause of the United States Constitution.  The last date of the offense of conviction is the controlling date for *ex post facto* purposes.  U.S.S.G. § 1B1.11 app. n. 2.  If a defendant is convicted of more than one offense and one of those offenses took place before the revision of

1    the applicable Guidelines and the other after the revision, the revised edition of the Guidelines

2    applies to both offenses. § 1B1.11(b)(3). The Ninth Circuit, however, held that U.S.S.G. §

3    1B1.11(b)(3) violates the *ex post facto* rule when the conduct is distinct and occurred at different

4    times. *United States v. Ortland*, 109 F.3d 539, 546-47 (9th Cir. 1997). The Ninth Circuit

5    instructed courts to use more than one Guidelines manual when sentencing defendants under

6    such circumstances. *Id.* at 546.

7         In her comments to the draft Pre-Sentence Report (PSR), Defendant relies on *Ortland* to

8    support her argument that applying § 1B1.11(b)(3) in this case is unconstitutional. She contends

9    that, because the fraud Guidelines were revised between 2000 and 2001, Counts 1 through 20

10    should be governed by the 2000 Guidelines, while Counts 21 and 22 should be governed by the

11    2003 Guidelines. Comments to PSR at 3-5 (Exh. 13) The government agrees that *Ortland*

12    controls and that Defendant's offense level should be calculated using the 2000 and 2003

13    Guidelines.

14         The Guidelines that were in effect at the time the criminal conduct was completed are the

15    proper Guidelines for calculating the offense level. A wire fraud violation is complete on the

16    date the wiring in furtherance of the fraud scheme is transmitted. *United States v. Scarano*, 975

17    F.2d 580, 585 (9th Cir. 1992). The wirings for the fraud schemes for which Defendant was

18    convicted occurred on the following dates:

19    //

20    //

21    //

22    //

23    //

24    //

25    //

26    //

27    //

28    //

**UNITED STATES' SENTENCING MEMORANDUM**
**CR-05-0208-07 WHA**       6

| Count | School District | Date | Trial Exhibit | Trial Transcript |
|-------|-----------------|------|---------------|------------------|
| 1 | West Fresno | June 19, 1990 | 176 | 1078 |
| 2 | Highland Park | May 31, 1990 | 164 | 1390 |
| 3 | Covert | March 19, 2001 | 269 | 1956 |
| 4 | Lee County | February 22, 2001 | 366 | 1977 |
| 5 | Jasper County | April 10, 2001 | 273 | 1972 |
| 6 | Ecorse | May 29, 2001 | 283 | 1970 |
| 7 | Ceria Travis | August 27, 2001 | 288 | 1964 |
| 8 | Muskegon Heights | May 30, 2000 | 159 | 339 |
| 9 | San Francisco | August 21, 2000 | 215 | 492 |
| 10 | W.E.B. Dubois | June 28, 2000 | 189 | 1076 |
| 11 | Luther Burbank | May 25, 2001 | 282 | 496 |

A conspiracy to commit wire fraud continues at least until overt acts in furtherance of the conspiracy are committed. *United States v. Kohl*, 972 F.2d 294, 298 (9th Cir. 1992). The evidence at trial showed that acts in furtherance of the conspiracy to commit wire fraud alleged in Count 22 took place in January 2004. *United States v. Green*, CR 05-0208-07, Trial Exhibit ("Tr. Exh.") 329; Trial Transcript ("Tr.") at 500. Thus, following *Ortland*, the 2000 Guidelines should apply to Counts 1 through 11, and the 2003 Guidelines apply to Count 22.[2]

## B.    Grouping the Antitrust and Fraud Counts

U.S.S.G § 3D1.2 requires that all counts involving "substantially the same harm" be grouped together. Here, because the counts all involve the same victims, USAC and the FCC, and the fraud and antitrust schemes are closely related, the harm should be grouped together into a single group. § 3D1.2 . In determining the offense level for this group, the offense Guidelines that produce the highest offense level drive the sentencing calculation. § 3D1.3.

Applying the 2002 Guidelines Manual to the antitrust offenses results in an offense level of 26:

---

[2] As discussed in the Part II.B., *infra*, the parties agree that the fraud, not antitrust, Guidelines drive Defendant's sentence. As a result, the government lists only the fraud counts here.

**UNITED STATES' SENTENCING MEMORANDUM**
**CR-05-0208-07 WHA**                    7

| | |
|---|---|
| Base Offense Level (§ 2R.1.1(a)) | 10 |
| Non-Competitive Bids (§ 2R.1.1(b)(1)) | 1 |
| Volume of Commerce (§ 2R.1.1(b)(2)(G)) | 7 |
| Role in the Offense (§ 3B1.1(a)) | 4 |
| Obstruction of Justice (§ 3C1.1) | 2 |
| Abuse of Position of Trust (§ 3B1.3) | 2 |
| Total Offense Level | 26 |

As discussed in great detail below, Counts 1 through 11 result in an offense level of 35, and Count 22 results in a level 36. The wire fraud counts clearly produce the highest offense level and, therefore, they are the focus of the government's Guidelines calculation.

**C.     Base Offense Level**

Under both the 2000 and 2003 Guidelines, the base offense level for wire fraud is 6. § 2F1.1(a); § 2B1.1(a)(1), respectively.

**D.     Enhancements**

**1.     Standard of Proof**

In general, the party bearing the burden of proof must meet a "preponderance of the evidence standard" on sentencing guidelines issues. *United States v. Howard*, 894 F.2d 1085, 1090 (9th Cir. 1990). When a sentencing factor has an "extremely disproportionate" effect on the sentence relative to the offense of conviction, however, the facts underlying that particular enhancement must be proven by clear and convincing evidence. *United States v. Staten*, 466 F.3d 708, 717 (9th Cir. 2006).

In this case, only the loss calculation would potentially implicate the "clear and convincing" standard. The other recommended enhancements involve increases of two to four levels, which do not result in an "extremely disproportionate" impact on sentencing. *See generally United States v. Jordan*, 256 F.3d 922, 927-29 (9th Cir. 2001). In any event, the government has met its evidentiary burden under either standard.

**2.     Role in the Offense**

Because of her role as an organizer or leader of a series of complex schemes to defraud,

**UNITED STATES' SENTENCING MEMORANDUM**
**CR-05-0208-07 WHA**                                    8

1   Defendant qualifies for a four-point enhancement under U.S.S.G. § 3B1.1(a).  In assessing

2   whether a defendant is an organizer or leader, courts consider "the exercise of decision making

3   authority, the nature of participation in the commission of the offense, the recruitment of

4   accomplices, the claimed right to a larger share of the fruits of the crime, the degree of

5   participation in planning or organizing the offense, the nature and scope of the illegal activity,

6   and the degree of control and authority exercised over others."  U.S.S.G. § 3B1.1(a), app n. 4.

7                                   **a.    Leader/Organizer**

8          Coconspirator George Marchelos, Green's assistant at VNCI, testified about Defendant's

9   role throughout the period charged in the Indictment.  He stated unequivocally that Defendant

10  was the "leader," and that he had been the "follower" throughout his working relationship with

11  her.  Tr. at 933; Tr. at  1107.  Marchelos testified that when Defendant and coconspirators met in

12  Cypress, California to put together E-Rate applications, Defendant's leadership role was clear.

13  Tr. at 991; Tr. at 993; Tr. at 995.  Bob Emery, the CFO of VNCI, also testified that "Judy was the

14  lead on behalf of the entire team."  Tr. at 2322.

15         Defendant's control was not limited to VNCI employees.  In fact, an employee of one of

16  the vendors with whom she worked referred to her as "mommy," because "she ran the show, and

17  that everything was done according to how she directed it."  Tr. at 1373, referring to Exhibit 170

18  at 110459*; see also* Tr. at 1888–89; Tr. at 1787–88; Tr. at 1812.

19         At trial, several witnesses discussed Defendant's leadership role.  Rodriguez testified that

20  Defendant raised the possibility of donations and orchestrated and ran the pre-installation

21
    meeting.  Tr. at 2235-38.  He also testified that Defendant gave a presentation to the school
22
    regarding grants to fund the Year 6 projects.  Tr. at 2238-39.  Mitchell stated that it was
23
    Defendant's idea to include Inter-Tel, Premio, and Sprig Electric as vendors for West Fresno's E-
24
    Rate project.  Tr. at 1559.  Plesset testified that Defendant ran the meeting to introduce and
25
    execute the Year 6 fraud scheme.  Tr. at 2468-69.  In addition to the voluminous testimony
26
27  confirming Defendant's decision-making authority, her planning of and participation in the

28

**UNITED STATES' SENTENCING MEMORANDUM**
**CR-05-0208-07 WHA**                    9

offenses, and her control of others,[3] the evidence also showed that Defendant recruited accomplices[4] and claimed a larger share of fruits of the crime.[5]

The overwhelming evidence shows that Defendant qualifies as a leader or organizer of the fraud schemes for which she was convicted. *See United States v. Colello*, 16 F.3d 193 (7th Cir. 1994) (holding that defendant sentenced on mail fraud charges arising from insurance-fraud scheme was subject to four-level enhancement under Sentencing Guidelines on ground that he was organizer or leader of scheme, considering that he was involved in 48 of 60 claims listed in government's summary of scheme, recruited some participants, supplied bulk of documentation, physically arranged and participated in many of the staged automobile accidents, directed fellow participants as to what they should say about accident, supplied cars and title documents, and supplied money and distributed insurance proceeds to participants, among other things).

### b.    Five or More Participants

To qualify for a four-point enhancement, the defendant must have been a leader or organizer of criminal activity that involved five or more participants or was "otherwise extensive." U.S.S.G. § 3B1.1. A "participant" is "a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1 app. n. 1. This includes Defendant herself, her employees, and clients who willingly participated in the fraud. *United States v. Hiralal*, 44 Fed.Appx. 176 (unpublished) (9th Cir. 2002) (citing *United States v. Egge*, 223 F.3d 1128, 1134 (9th Cir. 2000) (holding that defendant could be included as one of

---

[3]*See* above citations; Tr. at 1703–10; Tr. at 1717–20; Tr. at 1726; Tr. at 1728

[4] Tr. at 1698–99; Tr. at 1715; Tr. at 1723.

[5]*See* Tr. at 755–756; Tr. at 967–968

**UNITED STATES' SENTENCING MEMORANDUM**
**CR-05-0208-07 WHA**               10

participants)). A defendant need not have had control over all of the five or more participants.
*See United States v. Barnes*, 993 F.2d 680, 685 (9th Cir. 1993) (recognizing that "[t]he fact that [the defendant] did not supervise more than one participant does not preclude the enhancement [under § 3B1.1(b)] as a matter of law").

In this case, the evidence was overwhelming that five or more participants engaged in the fraud schemes. The testimony regarding the hiding of ineligible parts in the lists that were submitted to USAC shows the significant number of people involved and the complexity of the scheme. At least eight individuals participated in that one aspect of the scheme alone:

(1) Judy Green;

(2) George Marchelos (*See* Tr. at 1020–1022 (stating that Defendant would give others, including (1) Defendant, (2) Marchelos, (3) Allan Green, (4) Gerard McNulty, (5) Dean Howe, and (6) "Melissa" last name unknown, information to fill out block 5 of Form 471, which included the false-parts list); Tr. at 1159–1160 (stating that he had pled guilty because he made mistakes and that documents had been submitted that were not exactly truthful));

(3) Gerard McNulty (*See* Tr. at 2092–2093 (McNulty admitting to his involvement in the fabrication of the PBX parts list); Tr. at 1020–1022 (Marchelos' reference, cited above, as to McNulty's involvement); Tr. at 1032; Tr. at 2136 (McNulty stating that he felt that some actions he had taken were illegal));

(4) John Colvin (*See* Tr. at 2036 (McNulty told Colvin about making up parts list in Cypress); Tr. at 1992, (Colvin admitted to lying to the FBI to protect himself));

(5) Sohail Qasim (*See* Tr. at 1757 (Qasim admitting that he knew that NEC and Inter-Tel could not bill USAC for some parts and pieces of video and giveaways, requiring false documents to be submitted));

(6) Chuck Ferguson (*See* Tr. at 1814–1817 (Ferguson explaining that he hid mention of VNCI product, references Tr. Exh. 131, which also entails McNulty; Tr. at 1826–1827 (Ferguson knew Bogan parts not eligible, but was hidden on list that was to go to USAC));

(7) Dean Howe (*See* Tr. at 1020–1022 (Marchelos' reference, cited above, as to Howe's involvement);  Tr. at 2093–2094 (McNulty testifying that Howe added the JP Parts at Judy's direction)); and

(8) Allan Green (*See* Tr. at 1020–1022 (Marchelos' reference, cited above, as to Allan Green's involvement)).

Accordingly, because of the involvement of five or more participants, Defendant's actions as the leader qualify for the four-point enhancement.

### c.    Otherwise Extensive

Even if the Court finds that Defendant led or organized fewer than five participants, the four-point enhancement applies where the criminal activity was "otherwise extensive" and the Defendant oversaw at least one participant.  *See* U.S.S.G. § 3B1.1(a).  "Whether criminal activity is 'otherwise extensive' depends on such factors as (i) the number of knowing participants and unwitting outsiders; (ii) the number of victims; and (iii) the amount of money fraudulently obtained or laundered."  *United States v. Rose*, 20 F.3d 367, 374 (9th Cir. 1994) (citations omitted).  The number of persons that these schemes involved, even if not participants, was significant.  For example, each project required an implementation team to install the equipment.  The schemes also required the involvement of school officials as well as members of various companies, including those associated with Defendant.  All of these groups of people, combined with the amount of money fraudulently obtained (*see supra*), qualify as otherwise extensive, making a four-point enhancement appropriate.

//

//

//

//

**UNITED STATES' SENTENCING MEMORANDUM**
**CR-05-0208-07 WHA**                12

### 3.   Sophisticated Means

U.S.S.G. § 2B1.1(b)(9)(C) allows for a two-point enhancement if the offense involved a scheme that was "especially complex or especially intricate offense conduct."[6] *Id.* cmt. n. 8(B).  The Application Notes state that "conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts [] ordinarily indicates sophisticated means." *Id.*  The frauds for which Defendant was convicted qualify her for this two-point bump because they were highly complex and, in Count 21, included the use of fictitious or shell entities to execute and conceal the scheme.

### a.   Fictitious Entities, Corporate Shells

Defendant was the mastermind behind a scheme designed to deceive USAC into paying the full cost of technology projects at fifteen school districts in 2003 to 2004, as charged in Count 22.  As Richard Favara testified, Defendant and her co-schemers created the appearance that the fifteen school districts had received a grant to pay their required co-pay from Favara's purportedly independent foundation, the American Education Alliance ("the Alliance").  Tr. at 2373.  Defendant and her co-schemers caused documents to be created and submitted to USAC showing that the Alliance was an established non-profit with substantial assets when, in reality, the Alliance had no assets to fund such grants.  Tr. at 2374.

---

[6] The 2000 Guidelines include an enhancement for "more than minimal planning." § 2F1.1(b)(2).  This enhancement applies to cases involving more planning than typically required to commit a simple form of the offense. § 1B1.1(f).  Crimes "involving repeated acts over a period of time" qualify for the two-point increase.  *Id.*  The following discussion of the sophisticated means enhancement shows that Defendant engaged in an intricately planned, complex scheme.  She repeated similar schemes at each of the school districts in Counts 1 through 11 repeatedly over a period of four years.  The more than minimal planning enhancement, therefore, applies to Counts 1 through 11.

**UNITED STATES' SENTENCING MEMORANDUM**
**CR-05-0208-07 WHA**          13

Defendant and her co-schemers used the Alliance as a shell corporation to facilitate a fictitious flow of funds.  They developed a plan that had the co-scheming vendor companies pay the Alliance some of the E-Rate funds that the companies had received from USAC.  The Alliance then "donated" that money to the schools.  The schools used that "donated" money to "pay" the co-pay to the co-scheming vendors.  Tr. at 2374–2375.

To make the Alliance appear substantive to USAC—and not like the shell entity that it really was—Defendant provided Favara with false financial information about the Alliance's assets to post on the Alliance's website.  Tr. at 2375–2376.  Although he hesitated to post the false information, Favara ultimately did post it on the Alliance's website.  Tr. at 2375–2376.  Favara testified that he complied with Defendant's request because "we were so far down the road in trying to close a few of these so that we could breath [*sic*] financially, that stretching that piece, I thought . . . if that will help get this thing finally finished for Expedition [Networks, a business that he owned] that we get a few of these things closed, let's get it done."  Tr. at 2376.  This use of a fictitious entity as part of the elaborate deception in which Defendant engaged warrants the two-point sophisticated-means enhancement.

### b.    Complexity of the Schemes

With respect to Counts 1 through 11, in which Defendant did not use shell corporations, the complexity of the fraud schemes alone qualifies her for the sophisticated-means enhancement.  For example, as part of the schemes, Defendant used her specialized knowledge of the E-Rate program to create false parts lists that showed that funds were only to be spent on eligible items, when, in fact, funds had been allocated for ineligible items, such as video conferencing equipment.  Tr. at 1030–1032; Tr. at 1108.  Because of her expertise, Defendant

was able to hide the expenditures on ineligible items where they were likely to, and did, go unnoticed.  When a defendant uses specialized knowledge to perpetuate a fraud in this manner, a sophisticated-means enhancement is appropriate.  *See United States v. Little*, 230 Fed.Appx. 701, 703 (9th Cir. 2007) (unpublished) (holding that the sophisticated means enhancement was proper where the defendant used his "specialized knowledge of the [] system" to cleverly misuse Medicare codes and false claims); *see also United States v. Fletcher*, 50 Fed.Appx. 379, 380 (9th Cir. 2002) (in applying the similar sophisticated-means enhancement for tax cases, the court found the enhancement appropriate where the defendant, among other things, created false documentation, encouraged others to create false documentation, targeted a less sophisticated audience, and claimed that his advice was proper).

In addition to the false parts list, Defendant used her knowledge of the E-Rate program to further complicate the fraud schemes.  She created false school budgets, engaged in sham bidding practices, and manipulated USAC audit practices, all while making it appear as if she and her co-schemers were abiding by E-Rate program rules.  Considered as a whole, this conduct goes beyond the garden-variety fraud and, consequently, warrants a two-level enhancement.

### 4.    Abuse of Position of Trust

U.S.S.G. § 3B1.3 adds two points to Defendant's offense level if she abused a position of public or private trust.[7]  A "position of public or private trust"

---

[7] In general, this enhancement also applies if the defendant used a "special skill" in a manner that significantly facilitated the commission or concealment of the offense.  U.S.S.G. § 3B1.3.  Because the government seeks an enhancement for Defendant's role as a leader/organizer, however, it may not also argue for an enhancement based on her special skills.  U.S.S.G. § 3B1.3.

**UNITED STATES' SENTENCING MEMORANDUM**
**CR-05-0208-07 WHA**              15

refers to a position of public or private trust characterized by professional or managerial discretion (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference) . . . .  For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (*e.g.*, by making the detection of the offense or the defendant's responsibility for the offense more difficult).

U.S.S.G. § 3B1.3, app. n. 1.

"The primary trait that distinguishes a person in a position of trust from one who is not is the extent to which the position provides the freedom to commit a difficult-to-detect wrong." *United States v. Hill*, 915 F.2d 502, 506 (9th Cir. 1990).  Factors to be considered are (1) "the inability of the trustor objectively and expediently to determine the trustee's honesty" and (2) "the ease with which the trustee's activities can be observed."  *Id*.  The role that the position of trust played in facilitating the offense is also relevant to the analysis.  The enhancement applies only when the position of trust itself facilitated the crime in some "substantial" way.  U.S.S.G. § 3B1.3, app. n. 1.  In other words, the enhancement requires proof that the defendant exploited a trust relationship to facilitate the offense.  *United States v. Christiansen*, 958 F.2d 285, 288 (9th Cir. 1992).

There are two grounds that support an abuse-of-trust enhancement in this case.  First, Defendant, acting as the schools' agent, abused the position of trust in which USAC placed its applicants.  Second, Defendant's abuse of the consultant position is relevant conduct pursuant to U.S.S.G. § 1B1.3(a) and, therefore, qualifies her for the position-of-trust enhancement.

### a.    USAC Placed Applicants in a Position of Trust

Since its inception, the E-Rate program has been a "bottom-up" program, in that it allows schools to determine what system to install and what components to include.  USAC

makes no judgment as to the quality or content of the applicant-proposed system, but instead reviews E-Rate applications only for eligibility.  In order to provide this flexibility, the E-Rate program places a great deal of trust in the applicant schools and their agents.  For example, USAC relies on applicants to provide accurate information about their projects.  Tr. at 513, 544-45, 652.  USAC then uses that information to determine, first, if projects meet the program's eligibility requirements and, second, how to allocate program funds.  Tr. at 546-47.

Although it allows the schools to customize their technology plans, the trust that USAC places in E-Rate applicants also gives the schools, and their agents, the opportunity to abuse the program.  USAC receives 40,000 E-Rate applications each year.  Tr. at 425, 651-53.  All of the information that USAC receives, including information requested during follow-up reviews, comes from the applicant school itself.  Tr. at 545-48.  The schools certify that the information is correct.  Tr. at 544-45; 652-53.  Misrepresentations embedded in the application are, therefore, difficult for USAC to detect.

Defendant marketed herself to schools as "one-stop shopping" for their E-Rate needs, claiming that she and her team were experts who would oversee the design, application, and implementation of the E-Rate projects.  These schools, many of which lacked the expertise and resources to learn the details about the program and the technology, were vulnerable to her sales pitch.  They hired her as their consultant and gave her the freedom to handle all E-Rate issues with little or no supervision.  It was in this role of consultant that Defendant submitted, or caused others to submit, false and misleading information to USAC on behalf of the schools.[8]

_____

[8]Tr. at 1476–1477 (Mitchell, of West Fresno Elementary School District, stating that Defendant, as the district's paid consultant, was to assist in the district's application for eligible items through the E-Rate program, which included amending the school's technology plan,

**UNITED STATES' SENTENCING MEMORANDUM**
**CR-05-0208-07 WHA**                    17

Defendant exploited both the position of trust in which the schools placed her and the position of trust in which USAC placed E-Rate applicants and their agents.  These two abuses were inextricably intertwined.  *See United States v. Sherwood*, 98 F.3d 402, 412-13 (9th Cir. 1996) (standing for the proposition that a sentencing court should consider the harm done to all individuals who were directly impacted by defendant's conduct).  Defendant knew that, in preparation for and as part of her scheme to get money from USAC, she first had to gain the trust of the schools so that they would put her in a position in which she had the freedom to implement her schemes.  Only then, as the agent for the schools, could she take advantage of the trust that USAC placed in its E-Rate applicants.  *See Id.*; U.S.S.G. § 1B1.3(a)(1) and (2).  By submitting false and misleading information in order to deceive USAC into funding her projects, Defendant abused the trust that USAC placed in its applicants.  This qualifies her for a two-point enhancement.

### b.    Relevant Conduct

Although the schools were not the victims of the crimes for which Defendant was convicted, Defendant's abuse of her consulting position is relevant conduct that forms the basis for a position of trust enhancement.  *United States v. Duran*, 15 F.3d 131, 133 (9th Cir 1994)

---

creating an RFP, handling the bidder meetings, assisting in the final decision making, filling out forms, and responding to E-Rate questions and concerns); Tr. at 417–418 (Holodnick, of Muskegon Heights School District, noting that Defendant "had a certain level of expertise that I think [the district's superintendent] depended on"); Tr. at 827 (Newton noting that Defendant, as the school's consultant, was assisting West Fresno with its E-Rate project); Tr. at 1183; 1204–1205 (Maynard noting that Defendant was the consultant for the West Fresno E-Rate project and, in that role, she was to "help the district"); Tr. at 924–925 (Marchelos noting that "one of the attractive parts of [recruiting schools to sign up with their E-Rate team] at the show is [*sic*] we were able to leverage Mrs. Green's expertise as a grant writer and training in the E-Rate program to assist them with this cumbersome application process at no charge").

**UNITED STATES' SENTENCING MEMORANDUM**
**CR-05-0208-07 WHA**                18

(finding a position-of-trust enhancement appropriate, even though the crime of conviction did

not feature an abuse of a position of trust, because the court could properly consider "relevant

conduct other than that involved in the offense of conviction," as defined in U.S.S.G. §

1B1.3(a)). *United States v. Calozza*, 125 F.3d 687, 690–91 (9th Cir. 1997) (noting that the

applicability of the abuse-of-trust enhancement turns on "whether they are 'relevant conduct' as

defined by the guidelines, not whether they apply to the victim or the criminal's position with

respect to the crime to which the adjustments are being applied"); *see also, e.g.*, *United States v.

Haggard*, 41 F.3d 1320, 1325–26 (9th Cir. 1994) (concluding that a vulnerable-victim

enhancement was appropriate on an obstruction-of-justice charge based on a fruitless chase that

resulted after the defendant made a false claim that he knew the whereabouts of a kidnapped

child; although the crime was against the government, the circuit court concluded that the

sentencing court could look at the child's mother as the victim because a court "properly may

look beyond the four corners of the charge," and may consider "all harm" cased by relevant

conduct under U.S.S.G. § 1B1.3(a)).

   As discussed above, Defendant used her position as a consultant to carry out her fraud

schemes.  Because she was the E-Rate expert, schools trusted her as their agent and did not

supervise her.  She acquired and abused the consultant position in preparation for and in the

same course of conduct as the offenses for which she was convicted. U.S.S.G. § 1B1.3(a)(1)(A),

(B).  Thus, exploiting the trust of the schools is relevant conduct, and she qualifies for a two-

point enhancement.

### 5.  Obstruction of Justice

   The Guidelines instruct a court to increase the offense level by two

**UNITED STATES' SENTENCING MEMORANDUM**
**CR-05-0208-07 WHA**     19

> [i]f (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense . . .

U.S.S.G. § 3C1.1.  The commission of perjury at trial constitutes obstruction and merits the two-level sentencing enhancement.  U.S.S.G. § 3C1.1, app. n. 4(b); *United States v. Dunnigan*, 507 U.S. 87 (1993).  Before adjusting a defendant's sentence for obstruction, a district court must find that: "1) defendant gave false testimony; 2) the testimony was on a material matter; and 3) defendant had 'willful intent' to provide false testimony."  *United States v. Jimenez-Ortega*, 472 F.3d 1102, 1103 (9th Cir. 2007).  A matter is "material" if it "substantially affect[s] the outcome of the case."  *Dunnigan*, 507 U.S. at 95.  The false testimony must be "willful," not the result of confusion, mistake, or faulty memory.  *Id.* at 94.

Judy Green elected to take the stand and was the sole witness in her own defense.  During her testimony, she made at least four false statements that meet the test for obstruction of justice: (1) she denied that she had any involvement with the submissions to USAC for the Luther Burbank School District; (2) she claimed that she instructed vendors to use their profit, not USAC funds, to pay for value-adds; (3) she denied that Expedition Networks and Digital Connect bid on the same services at the same schools; and (4) she denied that she put Brien Gardiner's signature on submissions to USAC for Philadelphia Academy.

### a.   Luther Burbank (Count 11)

At trial, Judy Green emphatically denied that she had any involvement with the Item submission to USAC from the Luther Burbank school district that formed the basis for Count Eleven.  On direct examination, she stated that she worked on the Form 471s for a number of

schools, "with the exception of . . . Luther Burbank." Tr. at 2726. She repeatedly insisted that she "had nothing to do" with the Item 25 submissions from Luther Burbank, and that George Marchelos, not her, was responsible for them. Tr. at 2775, 2777-78, 2879, 2882-83, 2884. She claimed that George Marchelos and Steve Newton were lying when they testified that she was involved with Luther Burbank. Tr. at 2777-78. She further claimed, "I didn't even know that Luther Burbank existed." Tr. at 2777-78.

Judy Green's denials were blatantly inconsistent with her admission that she was the project manager at Luther Burbank and received $125,000 compensation for her services there. Tr. at 2777-78. They also contradict George Marchelos (Tr. at 1086-90, 1157), Steve Newton (Tr. at 758, 766-67), Gerard McNulty (Tr. at 2128-29), and Richard Rodriguez (2220-21, 2224-28, 2235-38), each of whom testified to Judy Green's significant involvement in the E-Rate program at Luther Burbank.

Trial Exhibit 13 and the testimony related to that exhibit confirm that Judy Green's denials were more than mere inconsistencies or mistakes; they were intentional lies. Trial Exhibit 13 is a letter signed by Judy Green and addressed to Richard Rodriguez, Superintendent of the Luther Burbank School District. The letter stated that "ALL of the information and documentation for Item 25 responses," including a pre-written cover letter, instructions for sending the documents, and a CD with supporting information for the responses, were enclosed with the letter. It also stated that, if there were any questions, Mr. Rodriguez should call 562-985-1394, one of Judy Green's phone numbers. Tr. Exh. 96; Tr. at 2418. Judy Green admitted on cross-examination that she wrote the letter, although she denied that the signature was hers. Tr. at 2884-85. She admitted that the note at the bottom of the page instructing Mr. Rodriguez

1    regarding information in the Item 25 submission was in her handwriting.  Tr. at 2885.  She also

2    admitted that the information and documentation for Luther Burbank's Item 25 response were

3    included with the letter.  Tr. at 2885.

4

5         Trial Exhibit 13, along with the testimony from five witnesses, including Defendant

6    herself, clearly show that Judy Green testified falsely when she repeatedly denied her

7    involvement with Luther Burbank's Item 25 submission.  Her denials were material because

8    they went to the heart of the fraud charge in Count 11: that Judy Green and her coconspirators

9    made false and misleading representations to USAC on Luther Burbank's Item 25 response.  In

10   light of the overwhelming evidence, Judy Green's denials could not have been the result of

11   confusion, mistake, or faulty memory; they were willful attempts to obstruct justice.

12

13

14                  **b.      Source of Funds for Value-Adds (Counts 1-11)**

15        Judy Green testified that vendors could not invoice USAC for ineligible bonus items, or

16   "value adds."  Tr. at 2689.  She stated that she instructed Inter-Tel to pay for value-adds, not

17   from E-Rate funds, but from the profit that the vendors expected to earn on E-Rate projects.  Tr.

18   at 2689-2690.

19

20        Several vendor representatives testified that Judy Green told them to include the cost of

21   value-adds in with the cost of eligible items.  Steve Newton testified that at a sushi restaurant in

22   Seal Beach, California, Judy Green explained to him the profit margins that Sema4 would make

23   on the Luther Burbank E-Rate project.  Tr. at 787-792.  Newton stated that Judy Green

24   calculated Sema4's projected profit margin on top of the cost of the value-adds.  Tr. at 792; 856-

25   57; 860-62.  He said that Judy Green told him that the cost of the value-adds "had to be folded

26   into the price of the entire project with the eligible products."  Tr. at 861; *see also* Tr. at 698-

27

28

**UNITED STATES' SENTENCING MEMORANDUM**
**CR-05-0208-07 WHA**          22

702.  Newton explained, "There's just no possible way that you could give away all of that stuff

and stay in business.  It's impossible."  Tr. at 861; *see also* Tr. at 698-702.  Duane Maynard of

Howe Electric also testified that Judy Green told him to include the cost of value-adds in with

the cost of the items paid for by the E-Rate program.  Tr. at 1217.  Like Newton, Maynard stated

that "Howe Electric wasn't in the business of giving stuff away."  Tr. at 1218.  He further

explained that Howe Electric was not willing to reduce its profit margin.  Tr. at 1218.  Inter-

Tel's Bill Boehm testified that Judy Green was aware that Inter-Tel was including such costs in

with the cost of eligible equipment.  Tr. at 1272-73.  Finally, Sohail Qasim testified that Judy

Green told NEC to include the costs of the value-adds in with the eligible equipment.  Tr. at

1709-11.

        In addition to this testimony, a memorandum that Judy Green wrote shows

unambiguously and in great detail that she instructed vendors to include the cost of value-adds

in with eligible items and to pay for them with E-Rate funds.  Trial Exhibit 256 is an email that

Judy Green wrote to Robert Emery and Carl Muscari of VNCI regarding the E-Rate project at

Highland Park in Year 3 (Count 2).  Tr. at 2299.  The cover letter, signed by Green, reads,

"Please see attachments, they clearly explain ALL and provide for internal and SLD appropriate

documentation."  Tr. Exh. 256 at VNCI - 150443 (emphasis in original).  The attachment

entitled "Financial Implementation for Highland Park Year 3 E-Rate" contains a breakdown of

how Judy Green expected VNCI to spend the $6.4 million that USAC had committed to

Highland Park for those portions of the project awarded to VNCI.  Tr. at 2300-2301; Tr. Exh.

256 at VNCI - 150444.  USAC allocated $4.4 million for data and $2 million for cabling.  Tr. at

2300-2301; Tr. Exh. 256 at VNCI - 150444.  Judy Green, however, planned to use the funds

differently.  She set aside $2.2 million for VNCI's profit and $4.2 million for cabling, data, and value-adds.  Tr. at 2302; Tr. Exh. 256 at VNCI - 150444.  She explicitly stated that VNCI was to provide "ineligible" "bonus items" out of the $4.2 million, *not* out of its $2.2 million profit.  Tr. Exh. 256 at VNCI - 150444.

Trial Exhibit 256 and the testimony of Newton,  Maynard, Boehm, and Qasim show that Judy Green testified falsely when she claimed that she instructed vendors to pay for value-adds from their profit.  This lie was material because the fraud counts alleged that Judy Green and her coconspirators deceived USAC into believing that school districts were applying only for eligible equipment, when, in fact, the defendants hid the cost of value-adds in with the costs of eligible equipment.  Indictment at ¶ 9.  Judy Green's testimony could not have been a mere mistake.  As Newton and Maynard explained, it did not make business sense for vendors to pay for the value-adds from their profit.  Trial Exhibit 256 shows clearly that Green understood this and instructed vendors to pay for value-adds from E-Rate funds.  That she told vendors otherwise is simply false.

### c.       Year Six Collusion (Count 22)

Judy Green testified on direct examination that in Year 6 of the E-Rate Program, 2003-2004, she prepared quotes for Expedition Networks and Digital Connect for their bids on E-Rate-funded services for the schools listed in Count 22.  Tr. at 2752.  She testified several times that Digital Connect and Expedition provided different services: Digital Connect provided telephone services and Expedition Networks was an Internet service provider.  Tr. at 2752, 2754.  On cross-examination, she again insisted that Expedition Networks and Digital Connect did not bid on the same items for the projects in Count 22.  Tr. at 2760-64.

**UNITED STATES' SENTENCING MEMORANDUM**
**CR-05-0208-07 WHA**                24

1

2    Judy Green's own testimony, however, showed that the companies did in fact bid on the

3    same projects and that Judy Green not only knew about it, but orchestrated it.  Judy Green

4    admitted on examination that she discussed with Digital Connect and Expedition Networks

5    what prices they should quote for the Year 6 E-Rate projects.  Tr. at 2755.  When asked whether

6    she directed the companies in any way to bid on certain parts of the projects, she did not say,

7    "no."  Tr. at 2755.   Instead, she answered by explaining for which portions they were allowed to

8    bid.  Tr. at 2755.  She claimed that "there was no competition" between the two companies, but

9    in her next sentence, she stated that, like Expedition Networks, "Digital Connect could also

10   provide Internet services."  Tr. at 2755.  She admitted that she "tried to equalize the dollars so

11   that the district applicant would have several companies to choose from."  Tr. at 2755-56.[9]

12

13        Exhibits 364 and 511 demonstrate that the contradictions in Judy Green's testimony

14   were not the result of mistake or faulty memory.  Exhibit 364 was a submission to USAC from

15   Temple City Unified School District, one of the schools listed in Count 22.  Tr. at 2761.  Judy

16   Green admitted that she helped put the submission together and provided some of the materials

17   for it.  Tr. at 2761.  The submission shows that Expedition Networks bid for "Telecom On

18   Premises Equipment" and  "Telecom Access Service" at Temple City.  Exh. 364 at USAC-

19   EDOC-000052-079, -80; Tr. at 2762-63.  It also shows that Digital Connect bid on telecom

20   equipment for Temple City.  Exh. 364 at USAC-EDOC-000052-089; Tr. at 2762-63.  Judy

21   Green denied that the companies bid on the same services at Temple City, but she did not deny

22   that the documents she assembled said otherwise. Tr. at 2763.  Exhibit 511 was comprised of

23

24

25

26

27        [9]Steve Newton and Erik Plesset confirmed that Judy Green was involved in preparing

28   quotes and deciding for which services Expedition Networks and Digital Connect would bid in
     2003.  Tr. at 812-27, 2463-66.

**UNITED STATES' SENTENCING MEMORANDUM**
**CR-05-0208-07 WHA**              25

quote sheets from Digital Connect and Expedition Networks for the Lee County project in

Count 22.  Exhibit 511 shows that the companies were submitting quotes on the same bid items.

Defendant's handwriting on the documents indicates that she was aware that the companies were

quoting the same items.  *See* Tr. at 2913-20.  Indeed, during cross-examination regarding

Exhibit 511, Defendant admitted explicitly that there was competition at Lee County between

Digital Connect and Expedition Networks.  Tr. at 2920.

Whether Expedition Networks and Digital Connect provided the same services or

competed on the same projects is material because it goes to whether the companies are

horizontal competitors.  In order to prove the Sherman Act charge alleged in Count 22, the

government had to show that the bid rigging occurred between horizontal competitors.  Judy

Green was clearly aware of this requirement.  When asked on direct examination what Digital

Connect was bidding on, she answered that Digital Connect and Expedition Networks were "not

competing.  They were providing different services."  Tr. at 2752.

Judy Green's testimony, coupled with Trial Exhibits 364 and 511, show that she knew

very well that Digital Connect and Expedition Networks were quoting the same services, and

she knew that whether they were competitors was relevant to the charges against her.  In light of

this evidence, her testimony that the companies did not compete is not only unbelievable, but a

calculated effort to obstruct justice.

### d.      Forged Signature (Count 21)

Judy Green denied that she forged the signature of Brien Gardiner, the Director of

Philadelphia Academy, on documents submitted to USAC in Year 6.  Tr. at 2771-75.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Testimony from Gardiner and evidence retrieved from Judy Green's computer, however, show that Green's denial was intentionally false.

Gardiner testified that Judy and her husband Allan told him that they would take care of all of the necessary paperwork for Philadelphia Academy's E-Rate application for Year 6. Tr. at 2509. Trial Exhibit 323 contained a letter to USAC, purportedly from Gardiner, certifying that he had been authorized to apply for E-Rate funding for Philadelphia Academy. Tr. at 2512; Tr. Exh. 323 at 53. Gardiner claimed that he never wrote or signed such a letter. Tr. at 2512. He stated that the signature looked like his, but the letter did not look familiar to him. *Id*.

On cross-examination, Judy Green testified that she did not put Gardiner's signature on any document submitted to USAC for Philadelphia Academy. Tr. at 2771. She then testified that the FBI searched a laptop computer at her home and imaged the hard drives. Tr. at 2771-72. Judy Green admitted that scanned signatures of Brien Gardiner were on the hard drive of that computer. Tr. at 2773-74; Tr. Exh. 18.

Whether Judy Green forged Gardiner's signature on submissions to USAC for Philadelphia Academy is material because Count 22 alleges, and Gardiner testified, that those submissions contained false and misleading information. Tr. at 2512-15. Given Gardiner's testimony and the uncontroverted evidence found on Defendant's computer, Judy Green's testimony that she did not put Gardiner's name on those submissions could be nothing less than an intentional lie.

In sum, the government has identified and substantiated the four intentionally false, material statements that Judy Green made at trial: (1) her denial that she had any involvement with the submissions to USAC for the Luther Burbank School District; (2) her claim that she

**UNITED STATES' SENTENCING MEMORANDUM**
**CR-05-0208-07 WHA**            27

1  instructed vendors to use their profit, not USAC funds, to pay for value-adds; (3) her denial that

2  Expedition Networks and Digital Connect bid on the same services at the same schools; and (4)

3  her denial that she put Brien Gardiner's signature on submissions to USAC for Philadelphia

4  Academy.  Each of these statements qualifies as an obstruction of justice and supports a two-

5  point enhancement.

6

7          **E.    Loss Calculation**

8          U.S.S.G. § 2B1.1 governs the calculation of loss in wire fraud cases.  Determining the

9  appropriate loss figure is a fact-specific process in which the court has considerable discretion.

10  *United States v. Zolp*, 479 F.3d 715, 718 (9th Cir. 2007) ("The guidelines do not present a single

11  universal method for loss calculation under § 2B1.1 – nor could they, given the fact-intensive

12  and individualized nature of the inquiry.").  The loss calculation need not be absolutely precise;

13  rather, the court "need only make a reasonable estimate of the loss based on available

14  information."  *Zolp.* 479 F.3d at 719, *citing* U.S.S.G. § 2B1.1, app. n. 3(C).

15          The Guidelines identifies two types of loss that a court should consider: actual and

16  intended.  Actual loss is the "reasonably foreseeable pecuniary harm that *resulted* from the

17  offense."  U.S.S.G. § 2B1.1, app. n. 3(A)(i) (emphasis added).  Intended loss is the "pecuniary

18  harm that was *intended to result* from the offense."  U.S.S.G. § 2B1.1, app. n. 3(A)(ii)

19  (emphasis supplied).  The total loss is the greater of intended or actual loss.  U.S.S.G. § 2B1.1,

20  app. n. 3(A); *United States v. Tulaner*, ___ F.3d ___, 2008 WL 80703 at 2 (9th Cir. 2008)

21  (affirming that the loss caused by a wire-fraud scheme should be based on the total pecuniary

22  harm the defendant sought to inflict).  In the special case of pecuniary harm involving

23  government benefits, "loss shall be considered to be not less than the value of the benefits

**UNITED STATES' SENTENCING MEMORANDUM**
**CR-05-0208-07 WHA**            28

obtained by unintended recipients or diverted to unintended uses . . . ."  U.S.S.G. § 2B1.1, app. n. 3(F)(ii).

In this case, Defendant was convicted of eleven counts of wire fraud (Counts One through Eleven), and one count of conspiracy to commit wire fraud (Count Twenty-two).  Those counts charged the Defendant with engaging in fraudulent conduct related to: (1) hiding the fact that the subject schools and school districts did not make their co-payment, resulting in the E-Rate Program paying all of the projects' costs; (2) including the cost of ineligible video equipment with the cost of eligible equipment and services; (3) including the cost of ineligible end-user equipment and services, or "value-adds," in with the cost of eligible equipment and services; and (4) including the cost of ineligible fees**,** referred to as marketing and management fees**,** in with the cost of eligible equipment and services.

Defendant's schemes were highly sophisticated, and calculating the loss attributable to her conduct is complex.  In order to simplify the analysis and arrive at an accurate and conservative figure, the government applied two overarching principles.  First, the government identified four categories of loss, based on the four categories of fraudulent activity identified above: (1) forgiven or waived co-pay; (2) ineligible VNCI video equipment; (3) ineligible end-user equipment; and (4) ineligible management and marketing fees.  Indictment, ¶ 9-11, 21-23. The calculations described in detail below are organized around the four categories.

Second, the government used a combination of actual and intended loss to arrive at a total figure.  For E-Rate projects in which funds were committed and disbursed, the government used the actual loss (Counts One through Seven, Ten, and Eleven).  Where an E-Rate application was submitted, but no funds disbursed, the government used the intended loss

**UNITED STATES' SENTENCING MEMORANDUM**
**CR-05-0208-07 WHA**          29

(Counts Eight, Nine, and Twenty-two).  Although the Guidelines allow calculation of loss based entirely on intended harm, U.S.S.G. § 2B1.1, app. n. 3(A), relying on actual loss whenever possible yields a more straightforward, accurate, and conservative loss amount.  The government's loss figures are also the net value of eligible equipment funded or requested at each project.  U.S.S.G. § 2B1.1, app. n. 3(F)(ii).

Employing these principles, the United States arrived at a total loss of approximately $47.2 million for Counts 1 through 11 and $9.8 million for Count 22.  In addition to the detailed descriptions below, attached Exhibits ("Ex.") 1 through 12 catalog the evidence supporting the loss calculation for each count.

### 1.    Co-pay

The FCC never intended the E-Rate program to pay for the entire cost of an applicant's project.  Rather, the program was designed to offer *discounts* for eligible equipment based on a school's financial need.[10]  12 FCC Rcd. 8776, 9035 (May 8, 1997) ("1997 FCC Order"); 47 C.F.R. § 54.505; Tr. at 531.  For example, the greatest discount available is 90%.[11]  Qualifying for a 90% discount means that the E-Rate program pays for 90% of the cost of the equipment and services supplied to the applicant.  This amount that USAC pays is the "discounted

---

[10]The FCC chose this discount approach "rather than providing a package of free services or block grants . . . [to] assure efficiency and accountability" and to "avoid unnecessary and wasteful expenditures because [the applicants] will be unlikely to commit their own funds for purchases that they cannot use effectively." 1997 FCC Order at 9035.  "A percentage discount also encourages schools . . . to seek the best pre-discount price and to make informed, knowledgeable choices among their options, thereby building in effective fiscal constraints on the discount fund." *Id.* at 9036.

[11]  Financial need is determined by a formula based on the number of students in a school district that are eligible for the Federal School Lunch program.  In general, the greater the number of school lunch participants, the higher the school's E-Rate discount.

**UNITED STATES' SENTENCING MEMORANDUM**

amount."  The school then pays its "co-pay," which, in this example, is the remaining 10% of

the cost of the equipment.  Tr. at 533.  Publically available FCC regulations informed both

applicants and service providers that it was the applicant's responsibility to pay the co-pay.  47

C.F.R. §§ 54.500(i) and 54.504(b)(2)(v); 1997 Order at 9079; Tr. at 545.

### a.      Counts 1-7, 10, 11[12]

Defendant was found guilty in Counts One through Seven, Ten, and Eleven of

submitting false and misleading information to USAC in order to hide the fact that the E-Rate

program was paying for the entire cost of the projects.  Contrary to Defendant's assertions, *see*

Objections to Draft Pre-Sentence "Draft PSR" Report at 3 ( Feb. 25, 2008) (Exh. 13), the E-Rate

program did suffer pecuniary harm from Defendant's deception.  Several witnesses testified that

the subject school districts did not pay any part of their co-pays; instead, the E-Rate program

paid for the entire cost of the subject school projects.  Tr. at 306, 706-708, 793-95, 1192, 1291-

1295, 1493-94, 1578, 1942-45, 2104-05, 2493.  As explained above, the FCC intended the E-

Rate program to pay only the discounted amount.  Thus, the loss in Counts One through Seven,

Ten, and Eleven is the co-pay that USAC unknowingly funded.  The government calculated this

figure by multiplying the amount that USAC disbursed to the vendors by the applicant's co-pay

percentage.

The Highland Park calculation illustrates the government's approach.  Defendant was

found guilty of fraud related to data cabling at Highland Park in 1999, as charged in Count Two.

Defendant caused an application to be filed with USAC for Highland Park seeking $900,000

---

[12]Count Nine pertains to San Francisco Unified School District.  No promise of waiver or forgiveness of copay was made by Defendant with respect to the SFUSD E-Rate funding application.

**UNITED STATES' SENTENCING MEMORANDUM**
**CR-05-0208-07 WHA**              31

for data cabling.  Highland Park's discount rate was 90%, so the discounted amount that USAC believed it should pay was $810,000.  Highland Park's co-pay was 10%, so the school district should have been responsible for $90,000.

Because Defendant told Highland Park that it did not have to pay its co-pay and concealed this fact from USAC, USAC funded the entire cost of the data cabling.  Thus, the effective total cost for the data cabling became $810,000, and $81,000, or 10% of $810,000, is the actual loss caused by Defendant.  The $81,000 is the extra amount that USAC funded because Defendant "waived" Highland Park's co-pay.  The government used this same method to calculate the co-pay loss shown in attached Exhibits 1 through 7, 10, and 11.[13]

### b.    Count 8

At Muskegon Heights, Defendant promised that the district's co-pay would be forgiven. Tr. at 307.   The school district, however, canceled its application before USAC committed any funds.  Tr. at 347.  In this case, the loss is the amount of funding for which Muskegon Heights applied multiplied by its co-pay percentage.  In other words, the loss here, as shown in Exhibit 8, is the intended loss.

### c.    Count 22

The government used intended loss to calculate the co-pay loss for Count 22 because, like Count 8, the projects were not funded.  As charged in Count 22, Defendant used sham foundation to deceive USAC into believing that the schools had secured access to funding from an

---

[13]The government calculated the loss in this manner for projects where funds were disbursed.  Although it may have been simpler to calculate the co-pay on the difference between the approved total amount and approved discounted amount, that would have overstated the actual loss inflicted on USAC for the projects that it did fund.

**UNITED STATES' SENTENCING MEMORANDUM**

independent source to cover the co-pay amount for each of these projects. In fact, Defendant planned to use E-Rate funds to pay for the entire cost of the projects. Tr. at 2374-75. To effectuate the conspiracy, Defendant submitted to USAC false grant letters from the sham foundation indicating that the fifteen applicants had been awarded grants equal to their co-pay amounts. Tr. at 2366-76.

Defendant prepared the Form 471 applications for these projects. Tr. at 2509, 2543. In those 471s, she set out the amount requested from the E-Rate program. She falsely certified on each 471 that the district had secured access to funding of the co-pay portion of the project. The co-pay amounts were equivalent to the amounts specified in the Alliance grant letters. Since the funds for those grants was going to come from the E-Rate funds received by the vendors, the co-pay loss amount for Count 22 is equivalent to the Alliance grant amounts. *See* Exh. 12.

### 2.  Ineligible Video Equipment

In E-Rate funding years 1999 and 2000, video equipment was not eligible. Tr. Exh. 31; Tr. at 537, 701, 1257-59, 1704. Defendant was found guilty in Counts One through Nine of engaging in fraud schemes that included providing false and misleading information to USAC to hide the fact that the cost of ineligible VNCI video equipment was included in the cost of eligible equipment for which E-Rate program funding was being sought. As a result, the E-Rate program unknowingly paid for ineligible VNCI video equipment, and the cost of that ineligible equipment counts towards the loss calculation.[14]

---

[14]In the case of the Muskegon Heights School District (Count 7) and the San Francisco Unified School District (Count 9), the Defendant and her coconspirator vendors intended to have the E-Rate program pay for the ineligible VNCI video equipment.

**UNITED STATES' SENTENCING MEMORANDUM**
**CR-05-0208-07 WHA**          33

Defendant argues that there was some question as to whether video equipment was ineligible for E-Rate program funding.  *See* Objections to Draft PSR at 2 Exh. 13.  Defendant's own statements contradict this claim.  Defendant told witnesses that, on its own, video equipment such as VNCI's video switch was not eligible for E-Rate program funding.  Tr. at 1704.  It was her opinion, however, that as long as the video equipment was "bundled" with eligible equipment, such a combination was eligible for E-Rate program funding.  Tr. at 1704.

Depending on the funding year in question, Defendant took two different approaches to "bundling" to avoid USAC's scrutiny of the ineligible video equipment.  In 1999, she created a device she dubbed a "PVBX."  The PVBX was a combination of VNCI video equipment and a telephone switch, or PBX.  No such device actually existed.  By styling the PVBX as a combination of video and telephone capabilities, she hoped that USAC would see the video capability as an inseparable feature of the eligible PBX and approve the funding of the "integrated" device on that basis.  She went so far as to falsely represent to USAC that the video switch was inseparable from the PBX switch in response to questions about providing pricing for the VNCI video equipment as a stand-alone product.  Tr. Exh. 74, Tr. at 1261-62, 1507-09.

In 2000, Defendant abandoned this approach in favor of disguising the VNCI video equipment as PBX parts, with phony part numbers concocted to make it appear that the parts lists submitted to USAC contained only eligible PBX parts.  Trial Tr. at 929, 1029-32, 1055, 1346-52, 1369, 1821-1823.  These were the lists containing "JP," or "Judy Parts," part numbers about which Defendant herself testified.  Tr. Exh. 15 and 23; Tr. at 1347-48, 2093-94, 2809.  Defendant hid from USAC the fact that video equipment was included with the cost of the PBX equipment because she knew that USAC would deny funding for that PBX equipment if it

1    discovered the video equipment.  Tr. at 1032.  Defendant's sophisticated and systematic efforts to

2    hide video equipment from USAC belies her argument that video equipment was somehow

3    eligible (Objections to Draft PSR at 2-3).

4

5        E-Rate funds were only supposed to be used for the equipment and services requested in a

6    school's 471 application.  Tr. at 428, 542-543, 548.  The 471 instructions required that the

7    applicant provide "a concise, but specific itemization of services provided" for which the

8    applicant was seeking funding.  Tr. Exh. 488, Tr. at 641-42.  No one informed USAC that Judy

9    Green and her co-schemers were planning on using E-Rate funding for VNCI video equipment

10   for the projects in Counts One through Nine.[15]  Because USAC never knew that the cost of video

11   equipment was embedded in the PBX costs, it had reason to believe that it was approving

12   funding only for PBX equipment.  USAC never authorized funding for video equipment.  Thus,

13   those E-Rate funds that were used, or intended to be used, to pay for video equipment count

14   towards the loss calculation.

15

16       Exhibits 1 through 7, attached, show the actual cost amounts for video equipment.  These

17   costs are based on invoices the coconspirator vendors received from VNCI and project cost

18   documents prepared by those vendors.  The government calculated the actual loss as the cost the

19   vendors assigned to the video equipment.  Exhibits 8 (Muskegon Heights) and 9 (San Francisco

20   Unified) show the costs the coconspirator vendors intended to incur or assign to the ineligible

21   VNCI video equipment if USAC had disbursed funds for those projects.  The intended cost

22

23

24

25

26

27   _____

28       [15]Costs for VNCI video equipment were not included with eligible equipment costs at
     W.E.B. DuBois (Count Ten).  Counts Eleven and Twenty-two are not included in this loss
     analysis because USAC made the VNCI video equipment eligible for funding for applications
     submitted in 2001 and thereafter.

**UNITED STATES' SENTENCING MEMORANDUM**
**CR-05-0208-07 WHA**              35

1
2
3

derives from the video equipment costs set out in the worksheets the vendors prepared in

determining bid amounts for those projects.

### 3. Ineligible End-User Equipment

4
5
6
7
8
9
10
11

The E-Rate program pays only for equipment and services that provide connectivity to a

school's classrooms. It does not pay for end-user equipment and services such as telephone

handsets, printers, modems, fax machines, cameras, video monitors, applications software,

training, or computers. Tr. Exh. 31, Tr. at 536. The program also does not pay for electrical

system upgrades, heating and air conditioning systems, or other school building improvements.

Tr. Exh. 31.

12
13
14
15
16
17
18
19
20
21
22
23
24
25

One of the ways the Defendant convinced the subject schools to hire her as a consultant

was to promise them that her vendors would provide end-user equipment at no cost as part of the

project. Tr. at 306, 923-25, 1549-50, 1578, 2237-38, 2403, 2492-93. Defendant informed her

coconspirator vendors that they would have to provide these end-user equipment and services to

the schools. She provided them detailed lists specifying what they had to provide and informed

them that they should include the cost of such ineligible equipment and services in with the cost

of the eligible equipment. The coconspirator vendors followed her direction. They included the

cost of the ineligible end-user equipment and services in with their bid amounts for eligible

equipment and services and intended to, and in several cases actually did, provide the ineligible

items to the schools covered by Counts 1 through 8, 10, and 11. Tr. at 700-01, 742, 748-750,

790-792, 1271-1273, 1718-1720, 1886-90, 1943, 1979, 2075-77, 2082-83.

26
27
28

Defendant used these misleading bid prices to create 471s for the subject schools. Tr. at

2098-2102. The 471 instructions required the applicants to identify the ineligible services for

**UNITED STATES' SENTENCING MEMORANDUM**

which they were applying and to separate the cost of those ineligible items from the cost of the applied-for eligible services and equipment.  Tr. Exh. 488 at USAC-00077.[16]  None of the 471s prepared by, or at the direction of, Defendant separately identified the costs of the ineligible end-user equipment and services that the coconspirator vendors were to provide.  Tr. Exh. 55-60, 117, 120, 125-127, 136-138, 361 and 001-059.  As a result, USAC never knew that the funds it eventually committed and disbursed were used to pay for ineligible end-user equipment and services.

Because the Defendant's coconspirator vendors were not entitled to E-Rate funds for ineligible end-user equipment and services and because the E-Rate program never authorized payments for such equipment and services, E-Rate funds spent on this ineligible equipment qualify as loss.  Exhibits 1 through 7, 10, and 11 show the costs of the ineligible end-user equipment and services that were included with the costs of the eligible equipment and services that were paid to the Defendant's coconspirator vendors.  In the case of Muskegon Heights (Exhibit 8), the cost figure represents the ineligible end-user equipment and services for which the coconspirator vendor intended to seek payment had the project gone forward.

### 4.    Ineligible Consulting Fees

The E-Rate program does not pay for consulting services.  E-Rate eligibility lists specifically excluded such services from reimbursement.  Tr. Exh. 31 at 214504.  Most of the coconspirator vendors committed to pay such fees to Defendant or the companies she worked for,

---

[16]Block 5, Item 21 of the 471 required the schools to "attach a description of the service, including a breakdown of the components and costs . . ."  Column G of Block 5 required schools to provide the dollar amount of components of the requested equipment and services that were ineligible for E-Rate funding.

and, on the projects that  received E-Rate program disbursements, actually paid those fees.  They

included the cost of those fees in with the eligible equipment bid prices and paid or intended to

pay for those fees from the eligible equipment payments they received or expected to receive

from USAC.  Tr. Exh. 121, 271, 487; Tr. at 792-93, 828-833, 1748-49, 1989-91, 2287, 2324,

2368, 2777.   None of the 471s prepared by, or at the direction of, the Defendant showed that the

costs of such fees were included with the costs of the eligible equipment and services for which

the schools applied.  Tr. Exh. 55-60, 117, 120, 125-127, 136-138, 361, and 001-059.  As a result,

USAC had no notice that funds it eventually committed and/or disbursed included money for

such fees.

Because the Defendant's coconspirator vendors were not entitled to E-Rate funds for

consulting fees and because the E-Rate program never authorized payments for such fees, the

portion of eligible equipment costs that covered such fees are included in the loss calculation.

Exhibits 2 through 7 and 11 show the fees that were either paid to the Defendant through her

company, ADJ Consulting, or paid to her employer, VNCI.  In the case of Muskegon Heights

(Exhibit 8), San Francisco Unified (Exhibit 9), and the 2003/2004 projects (Exhibit 12), the

coconspirator vendor intended to include fees with equipment costs on which they intended to

seek reimbursement from the E-Rate program if the projects had gone forward.  Tr. Exh. 121, Tr.

at 1748-49.  For those counts, the loss figure is the intended loss.

### 5.    Total Loss

As noted in II.A., above, the fraudulent schemes covered by Counts 1 through 11 were

completed prior to November 2001.  Following *Ortland*, 109 F.3d at 546-47, the 2000

Guidelines Manual applies to that conduct.  In the 2000 Guidelines, § 2F1.1(b)(1) governs the

**UNITED STATES' SENTENCING MEMORANDUM**
**CR-05-0208-07 WHA**                38

loss calculation for wire fraud.

Based on the discussion above, and as shown in Exhibits 1 through 11, the total loss

attributable to the Defendant's conduct in Counts 1 through 11 is as follows:

| | |
|---|---|
| Co-pay | $ 8,924,620 |
| Ineligible Video Equipment | $21,698,267 |
| Ineligible End-User Equipment | $13,109,835 |
| Ineligible Consulting Fees | $ 3,451,042 |
| Total Loss | $47,183,764 |

Under the 2000 Guidelines, a loss of this magnitude results in a 17-level increase to the base

offense level.  § 2F1.1(b)(1)(R).

The fraudulent schemes covered by Count 22 continued into January 2004.  Under

*Ortland*, § 2B1.1 of the 2003 Guidelines Manual applies to that conduct.  Since § 2B1.1

remained unchanged between 2003 and the present, the government calculated the offense level

for Count 22 using the current 2007 Guidelines.  U.S.S.G. §1B1.11(a).

Based on the discussion above, and as shown in Exhibit 12, the total loss attributable to

the Defendant's conduct in Count 22 is as follows:

| | |
|---|---|
| Co-pay | $ 6,826,055 |
| Ineligible Consulting Fees | $ 3,016,000 |
| Total Loss | $ 9,842,055 |

Under the current Guidelines, a loss of this magnitude results in a 20-level increase to the base

offense level.  § 2B1.1(b)(1)(K).

**F.    Combined Offense Level**

Although it directed courts to apply more than one Guidelines manual to multiple counts

involving offenses completed at different times, the Ninth Circuit offered no guidance for how to accomplish this.  Courts that have followed *Ortland* have determined that, under U.S.S.G. § 3D1.2, similar conduct that would be subject to an earlier Guidelines manual should be grouped together as one group, and the conduct that would be covered by a more recent manual should be placed in another group.  *See United States v. Cartier*, 2007 WL 2712939 (D.N.D., Sept. 14, 2007); *United States v. Johnson*, 1999 WL 395381 (N.D.N.Y., June 4, 1999).  The Courts then followed the grouping rules in U.S.S.G. § 3D1.4 to arrive at a combined offense level.

Using this method, the government first calculated the offense level for each group:

| Group 1: Counts 1-11 (2000 Guidelines) | |
| --- | --- |
| Base Offense Level (§ 2F 1.1(a)) | 6 |
| Loss (§ 2F1.1(b)(1)(R) | 17 |
| More than Minimal Planning (§ 2F1.1(b)(2)) | 2 |
| Sophisticated Means (§ 2F1.1(b)(6)(C) | 2 |
| Role in the Offense (§ 3B1.1(a)) | 4 |
| Obstruction of Justice (§ 3B1.1) | 2 |
| Abuse of Trust (§ 3B1.3) | 2 |
| Total Offense Level | 35 |

| Group 2: Count 22 (2003 Guidelines) | |
|---|---|
| Base Offense Level (§ 2F 1.1(a)) | 6 |
| Loss (§ 2F1.1(b)(1)(R)) | 20 |
| Sophisticated means (§ 2F1.1(b)(6)(C)) | 2 |
| | |
| Role in the Offense (§ 3B1.1(a)) | 4 |
| Obstruction of Justice (§ 3B1.1) | 2 |
| Abuse of Trust (§ 3B1.3) | 2 |
| Total Offense Level | 36 |

U.S.S.G. § 3D1.4 determines the combined offense level by starting with the group with the highest offense level, here Group 2. The offense level then increases by increments specified in a table in § 3D1.4, depending on the relative seriousness of the offenses. Applying those rules here results in a combined offense level of 38:

| Highest offense level | 36 |
|---|---|
| Adjustment for Group 1 (§ 3D1.4(a)) | 1 |
| Adjustment for Group 2 (§ 3D1.4(a)) | 1 |
| Combined Offense Level | 38 |

Thus, following *Ortland* and the line of cases interpreting it, using conservative loss figures and applying enhancements that are well supported by the record, the government calculates a Guidelines sentence level of 38. This translates into a recommended period of incarceration of 235 to 293 months.

## III.   SECTION 3553 ANALYSIS

After calculating the correct Guidelines range, the Supreme Court instructs courts to

carefully consider the factors listed in 18 U.S.C. § 3553(a).  *Gall*, 128 S.Ct. at 596-97.  Section

3553(a) identifies seven main criteria that are relevant to this case: (1) the nature and

circumstances of the offense; (2) the history and characteristics of the defendant; (3) the

seriousness of the offense, just punishment, and respect for the law; (4) deterrence to criminal

conduct; (5) protection of the public from future crimes by the defendant; (6) the need to avoid

unwarranted sentence disparities; and (7) the sentencing range established by the Guidelines.

Each factor weighs in favor of a sentence within the Guidelines range.[17]

### A.    Nature and Circumstances of the Offense

The offense in this case involved the manipulation of the FCC's E-Rate program.  The E-

Rate program was created to help needy schools connect to the Internet.  Local decision makers

designed their own technology plans and applied to E-Rate for funding assistance.  Tr. at 538-39.

The program funded only eligible items and the schools were required to pay a percentage of the

cost.  Tr. at 532-34.  In this way, E-Rate empowered local school officials and relied upon their

responsible participation, while still maintaining control over the scope of the program.

Defendant subverted E-Rate rules and deceived program administrators in order to redefine the

program on her own terms.  She created the program that she wanted, disregarding the

established rules and even the needs of the schools themselves.

_____

[17] Section 3553(a)(2)(D) requires a court to consider the need for the sentence imposed "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  The government knows of no training, medical, or treatment needs that would impact Defendant's sentence.  Defendant has no problems with drug or alcohol dependency, and although she has some medical issues, they do not appear relevant to sentencing.  *See* PSR at ¶¶ 80-84.

Section 3553(a)(7) requires a court to consider the need to provide restitution.  Here, civil suits against the coconspirator vendors have resulted in substantial penalties.  Since the victims have been compensated by more than actual civil damages, restitution is not an issue here.

**UNITED STATES' SENTENCING MEMORANDUM**
**CR-05-0208-07 WHA**                    42

Defendant familiarized herself with E-Rate program rules and procedures while the program was still new, marketed herself as an E-Rate expert to schools with high percentages of disadvantaged students, and then schemed to have the E-Rate program pay for unauthorized equipment and services to enriched herself and her accomplices.  She did this intentionally, repeatedly, and extensively over a number of years, in many school districts around the country.  To schools, she was an aggressive marketer who promised end-user equipment and projects at no cost, despite contrary E-Rate regulations.  Tr. at 923-24.  To vendors, she was domineering and churned through partners, most of whom distanced themselves from her after they realized the extent of her fraudulent behavior.  Tr. at 879.  To USAC, she was virtually unknown, in most instances creating and submitting documents on behalf of others.  Tr. Exh. 13, 73, 90; Tr. at 1504, 1583-85, 2730-32.

Defendant carried out her schemes by controlling the paperwork flow from the applicants to the program administrators.  Using her extensive knowledge of the E-Rate program, she created, or supervised others who created, E-Rate applications, answers to E-Rate's follow-up questions, and billing documents.  Tr. at 804-809, 993-95, 1489, 1504, 2730-31.  These documents were replete with outright falsehoods, half truths, and material omissions, such as the false PBX parts schedules which hid the video equipment intended to be installed.  *See* Tr. Exh. 15.  She was so successful that the program administrators had no idea that E-Rate paid all of the project costs in addition to goods and services that were not identified in the applications they approved.

In sum, Defendant's schemes were elaborate and extensive.  They involved many individuals, from vendor employees to school districts, technology experts to school

administrators.  Defendant created an intricate hub-and-spoke bid-rigging conspiracy, coupled

with a fraud scheme to deceive a government program that relied on the truthfulness of its

participants.  The effect of these crimes was widespread, and as the loss numbers show, their

impact was significant.  Accordingly, they merit a serious punishment.

### B.    History and Characteristics of the Defendant

These crimes were not the impulsive acts of an immature or inexperienced individual.

Defendant was a seasoned school administrator, with several degrees and significant work

experience, who aggressively marketed herself as an E-Rate expert.  *See, e.g.*, Tr. at 813, 1787-

88.  In late 1998 and 1999, she maintained her administrator position at Los Angeles Unified

School District (LAUSD) while she moonlighted as an E-Rate consultant.  In late 1999, she left

LAUSD to work as VNCI's E-Rate manager.  Her projected commissions for 1999 and 2000

would have been over $1 million if the projects had gone through as she intended.  Tr. at 1086.

If the 2003-2004 schemes had been successful, she was in line to receive over $2 million from

Expedition Networks and Digital Connect Communications.  Tr. at 792-93.

As discussed in II.D.2.a., *supra*, the evidence at trial was overwhelming that she was the

undisputed leader of the schemes.  Tr. at 933:2-5; 2322; 1787:23-1788:4; 1846:20-24.  Several

vendor witnesses testified that she was aggressive, controlling, and authoritative in her dealings

with them.  Tr. at 1877:7-17; 1745:7-15; 1898:19-1899:3.  At trial, she denied responsibility for

the crimes for which she had been charged and, to date, has not provided any statement of

acceptance of responsibility.  *See* PSR at ¶52.

Defendant's actions were reasoned, well planned, and entirely intentional.  She is well

educated and experienced and used that education and experience to enrich herself through

**UNITED STATES' SENTENCING MEMORANDUM**
**CR-05-0208-07 WHA**                    44

criminal means.  She has accepted no responsibility for her actions.  This history and personal

characteristics support the Guidelines sentence.

C.      **Seriousness of the Offense, Respect for the Law and Just Punishment**

1.      **Seriousness of the Offense**

The E-Rate program collects and awards over $2 billion a year.  Despite this large sum, in

every year but the first, the program has not had nearly enough money to meet the demand.[18]

Indeed, in most years, only the most disadvantaged schools, those schools that had 70 percent or

more students receiving free or reduced lunches, received internal connections funds.[19]  Indeed,

Defendant marketed herself as the E-Rate expert who could secure funding in this competitive

environment.  This makes Defendant's decision to spend millions on items not eligible for E-

Rate funding, and demand a kickback on all the projects she managed, all the more

unconscionable.  Because of her actions, schools that could have used E-Rate money were denied

funding.

_____

[18]Defendant has disputed this contention.  Defendant's protestation is misplaced as it confuses the "distribution" of money with the "award" of money.  Each year the program awards all $2.25 billion of the available funds, but sometimes schools do not move forward with their projects, or use less than what was awarded.  This awarded money is not disbursed.  Thus**,** in any given year the program ends up with some money that was awarded but never distributed**.**  Indeed, in this case (Count 9), San Francisco Unified was awarded nearly $50 million in 2000, but that money was never disbursed because suspicions arose over its application.  In that case, because the awarded funds were allocated for use at SFUSD, other worthy applicants in 2000 could not access those funds.  That money was then added to the funds for disbursement and award in the following funding year.  Moreover, because Defendant**'**s actions grossly inflated the costs of the projects charged in the indictment, USAC was not able to fund other applications in that funding year.  *See* Tr. at 1848:3-10.

[19]Internal connections was the largest of several "buckets" of E-Rate funding.  E-Rate also funded Internet connectivity (cable charges) and telecommunication services (phone bills).

**UNITED STATES' SENTENCING MEMORANDUM**
**CR-05-0208-07 WHA**                    45

Defendant carried out her schemes at over two dozen projects over a six-year period, where the total E-Rate funds actually spent were well over $45,000,000. In addition, she requested funds for other schools of close to $100,000,000. Within the categories the government has identified, the loss totals, conservatively, over $50,000,000. *See* II.C.5 *supra*; PSR at ¶¶ 50, 59.

Although $50,000,000 is a large loss figure, it understates the true harm. The subject projects either would not have occurred, or the dollar value of the projects would have been greatly reduced, absent Defendant's influence. Thus, when considering the seriousness of the offense, the loss figure reasonably could extend beyond the misspent money to encompass the entire amount spent on the projects. By any measure, however, Defendant's crimes are extremely serious.

### 2.      Respect for the Law

Defendant was well versed in the E-Rate program and marketed herself as an E-Rate expert. She was successful in many of these crimes because she was able to convince vendors and school districts that she knew the program rules and procedures better than they did. One of the ironies of this case is that Defendant's accomplices entered into their relationships with her believing that she knew what was appropriate and legal and that all they had to do was follow her instructions to be compliant. Now, many find themselves shamed and convicted for, as one witness put it, the bad decisions of joining Defendant's team and following her directions. Tr. at 879. The evidence at trial, including documents that Defendant created, revealed that Defendant knew that she and her co-schemers were deceiving and misleading the E-Rate administrators. Tr. at 1031-32, 2716, 2724, 2729-30, 2733-34. This callous disregard for the program's rules, and

**UNITED STATES' SENTENCING MEMORANDUM**
**CR-05-0208-07 WHA**                    46

her aggressive actions to pressure others into disregarding the program's rules, shows a blatant

disrespect for the law.

### 3. Just Punishment

Relying on Application Note 19(C) to U.S.S.G. § 2B1.1, Defendant contends that a

downward departure is appropriate because she "was not trying to 'steal' tens of millions of

dollars."[20]  Defendant's Objections to Draft PSR at 3 Exh. 13.  No such departure is warranted.

Defendant improperly focuses on just one facet of her crimes – her personal, monetary benefit –

and does not consider the full range of the harm she caused.  The Guidelines view harm more

broadly: they factor in the amount of money misspent (loss), the size and scope of the schemes,

the role of the defendant vis-a-vis her accomplices, the extensiveness of the defendant's

involvement in the criminal conduct, the number of victims and extent of harm to these victims,

and the degree of remorse by the defendant.

Taking all of these criteria into consideration, the harm Defendant caused was

considerable.  The amount of money misspent amounted to tens of millions of dollars; she was the

leader/organizer of the schemes; she perpetrated her schemes over many years at many different

schools using many different technology companies as accomplices; the operation of her schemes

foreclosed USAC's ability to fund many other projects; and she has shown absolutely no

inclination to accept responsibility for her crimes.  She even lied on the witness stand.  Finally,

she stood to receive several million dollars if her schemes had succeeded.  The Guidelines reflect

this broader concept of harm, and thus provide a more sensible basis for determining Defendant's

---

[20]Application Note 19(C) to U.S.S.G. § 2B1.1 allows for a downward departure when the Guidelines level "substantially overstates the seriousness of the offense."

**UNITED STATES' SENTENCING MEMORANDUM**
**CR-05-0208-07 WHA**                47

sentence.  Defendant's suggestion that the Guidelines should be ignored or devalued is inappropriate.

### D.      Provide Deterrence to Criminal Conduct

Defendant's criminal conduct began in the first years of the E-Rate program and lasted more than six years.  Her conviction represents the culmination of the most extensive E-Rate fraud investigation to date.  The E-Rate program continues to receive tens of thousands of applications annually, and the basic regulations and philosophy, including trust in the applicants, remains the same.  Under these circumstances, the punishment in this case will be closely watched, both by those administering the program and by those considering abusing the program.  A significant sentence is needed to convince others that the penalties for abusing the E-Rate program are not worth the potential financial rewards.

### E.      Protect the Public from Further Crimes

To date, Defendant has seemed impervious to feedback that her conduct was improper.  Witnesses Colvin, McNulty, Boehm, King, Emery, and Holodnick, testified that they told her repeatedly that her conduct was inappropriate, inconsistent with the rules of the E-Rate program, and should cease.  *See* Tr. at 354-46, 1997-98; Tr. Exh. 165.  She ignored their advice and replaced those who questioned her.  By late 2002 and early 2003, the time period of Counts 21 and 22, the government had begun investigating Defendant, and the FBI had visited her home and asked her pointed questions about her E-Rate activities.  *See* Judy Green 302, Apr. 4, 2002 and Oct. 24, 2002, attached as Exhibits 14 and 15.  Despite clear warnings from the FBI, her vendor accomplices, and school officials, Defendant continued to pursue her schemes.  In fact, she

engaged in more egregious conduct, such as the fake foundation scheme covered by Counts 21 and 22, after she received those warnings.

The fake foundation scheme surfaced as a new "wrinkle" in Defendant's plans after 2002. It was a sophisticated deception in which Defendant and her co-schemers led USAC to believe that schools had secured legitimate grants for their co-pays, budgeted money to make use of the new technology, and conducted a competitive bidding process to choose vendors. None of these things occurred. When USAC asked follow-up questions, Defendant and her co-schemers submitted false documents, some of which included the forged signatures of school officials. *See* Tr. at 2384-85, 2512-13.

In sum, warnings from Defendant's accomplices and clients and law enforcement officials proved insufficient to deter her criminal conduct. Even a long trial and a 22-count conviction appear to have had little deterrent effect. Her own trial testimony and the probation officer's report indicate that she believes she did nothing wrong. Tr. at 2717, 2722-23, 2730, 2733-34; PSR at 15 ¶ 53. There is no reason to believe that Defendant would not engage in similar conduct again.

### F.    Need to Avoid Unwarranted Sentence Disparities

To date, only three defendants have been sentenced for fraud related to the E-Rate program. In 2007, a federal jury convicted Rafael G. Adame, owner and president of ATE Tel Solutions, Inc., of seven out of nine counts of wire fraud. *United States v. Adame*, 06-CR-1082 (S.D. Tex., Feb. 9, 2007). At sentencing, the court found the loss associated with Adame's conduct to be over $400,000, resulting in a Guidelines range of 33 to 41 months. Adame was sentenced to 36 months incarceration. *See* Exhibit 16.

**UNITED STATES' SENTENCING MEMORANDUM**
**CR-05-0208-07 WHA**                    49

Brothers Haider and Qasim Bokhari operated a consulting company to assist schools in applying for E-Rate funds.  In 2005, they pleaded guilty to charges of conspiracy to commit mail fraud, mail fraud, conspiracy to commit money laundering, and money laundering.  *United States v. Bokhari*, 04-CR-56 (E.D. Wisc., Jan. 28, 2005, Apr. 5, 2005).  The court attributed a loss of over $16 million to both defendants, and sentenced them to 72 and 63 months incarceration, respectively. *See* Exhibits 17 and 18.

These three defendants received significant periods of incarceration based on loss figures much lower than those attributable to Judy Green.  Thus, imposing a Guidelines sentence here would not create any unwarranted sentence disparity among comparable cases.

## G.    Sentencing Guidelines

Although the Guidelines are advisory, a sentencing court is obliged to begin its analysis with a correct Guidelines calculation and "remain cognizant" of it throughout the sentencing process.  *Gall*, 128 S.Ct. at 597, n.6.  Section 3553 (a)(4) and (b)(1) underscore the importance of the Guidelines in determining a sentence.  If a sentencing court decides to depart from the Guidelines, the justification for the deviation must be "sufficiently compelling to support the degree of the variance."  *Id.* at 597.

The government believes that the Guidelines sentencing range for the wire-fraud and bid-rigging counts of which Defendant was convicted is appropriate.  It appropriately reflects the seriousness of the harm done and takes into consideration any mitigating factors.  As discussed extensively in this Memorandum, the crimes Defendant committed are indeed serious and they deserve a commensurate punishment.

In sum, each of the §3553(a) factors weighs in favor of a sentence consisting of a significant period of incarceration.  Defendant's crimes were elaborate and extensive; Defendant used her education and experience to carry out reasoned, well-planned, and entirely intentional crimes; the loss from her crimes conservatively amounts to over $50 million; she has shown blatant disrespect for the law; she took advantage of a program that trusted schools in order to enrich herself; there is no reason to believe that she will not repeat these crimes; other courts have sentenced E-Rate fraud offenders to significant jail time; and a tough sentence will deter future E-Rate fraud by others.  To be sure, the Guidelines range of 235 to 293 months is a stiff penalty, but the circumstances of this case warrant it.

## IV.    CONCLUSION

Using a conservative loss calculation, applying enhancements that are well supported by the record, and abiding by the *ex post facto* rule, the government arrived at an offense level of 38. Section 3553 offers no justification to deviate from the Guidelines.  Thus, consistent with a level 38, the government recommends a sentence of 235 to 293 months incarceration.


Dated: March 12, 2008


                                          /s/ Richard B. Cohen
                                         MICHAEL F. WOOD
                                         RICHARD B. COHEN
                                         BRIAN J. STACK
                                         JASON M. KATZ
                                         ALBERT B. SAMBAT
                                         ANNA TRYON PLETCHER
                                         Trial Attorneys
                                         Antitrust Division
                                         U.S. Department of Justice

**UNITED STATES' SENTENCING MEMORANDUM**
**CR-05-0208-07 WHA**                  51

1

<u>CERTIFICATE OF SERVICE</u>

2

3
I certify that on this 12th day of March 2008, I caused to be served the foregoing **UNITED**

4
**STATES' SENTENCING MEMORANDUM** by electronically transmitting a true copy thereof

5
to the person and/or office of the persons set forth below:

6
Richard Mazer                                    Alan A. Dressler

7
richardbmazer@yahoo.com                          alandressler@aol.com
Attorney for Defendant Earl Nelson               Attorney for Defendant Howe Electric, Inc.

8

9
Gail Shifman                                     Erik G. Babcock
gail@shifmangroup.com                            Erik@babcocklawoffice.com

10
Attorney for Defendant Howe Electric             Attorney for Defendant Judy Green

11
Mark Rosenbush                                   Geoffrey A. Hansen

12
markrosenbush@mindspring.com                     Federal Public Defender
Attorney for Defendant Allen Green               geoffrey.hansen@fd.org

13
                                                 Attorney for Defendant George Marchelos

14

15
Garrick S. Lew                                   Walter Brown
gsl@defendergroup.com                            Wbrown@orrick.com

16
Attorney for Defendant Steven Newton             Attorney for Defendant William Holman

17

18
I declare under penalty of perjury that the foregoing is true and correct.  Executed on the
12th of March 2008 at San Francisco, California.

19

20
                                                 /s/Richard B. Cohen
                                                 RICHARD B. COHEN

21
                                                 Trial Attorney

22

23

24

25

26

27

28

**UNITED STATES' SENTENCING MEMORANDUM**