IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>JUDY GREEN,<br><br>    Defendant.<br>                                     / | No. CR 05-00208 WHA<br><br>**ORDER DENYING DEFENDANT JUDY GREEN'S MOTION FOR RELEASE PENDING APPEAL AND GRANTING REQUEST FOR PROVISION OF EXPEDITED TRANSCRIPT** |

**INTRODUCTION**

In this wire-fraud and antitrust prosecution, the government charged defendant Judy Green with fraudulently securing funding through the government's E-Rate program. She was convicted of numerous counts of wire fraud, antitrust violations, and conspiracy to commit fraud. She now moves for an order continuing her release on her own recognizance pending resolution of her appeal, pursuant to 18 U.S.C. 3143(b). For the reasons stated below, the motion is **DENIED**.

**STATEMENT**

A more detailed procedural history of the case can be found in prior orders (Dkt. Nos. 558 and 617). In short, Congress created the E-Rate program to provide school districts with funds to purchase equipment and services. Rather than submit to competitive bidding, school district purchasers and vendors, under the guidance of defendant Judy Green, bilked the E-Rate program out of funds by making false representations about co-pays and what equipment was applied for.

The government charged multiple defendants with the scheme. All pled guilty except Ms. Green. After a month-long trial, a jury convicted her of eleven counts of wire fraud, ten counts of antitrust violations, and one count of conspiracy to commit fraud. The loss amount was estimated to be around $30 million. Her motion for a judgment of acquittal and for a new trial was denied.

In March 2008, Ms. Green was sentenced to 90 months in prison, two years of supervised release, and a special assessment fee of $2,200. The 90 months were broken down as follows: she received sixty months for the wire fraud, thirty consecutive months for the antitrust violations, and sixty months for one count of antitrust violation and one count of conspiracy (which ran concurrently with the sixty-month sentence for wire fraud). She was also ordered to report to the Bureau of Prisons in May 2008. She has since appealed. Ms. Green now moves for an order allowing her to remain released on her own recognizance pending the outcome of her appeal.

**ANALYSIS**

According to a provision of the Bail Reform Act, 18 U.S.C. 3143(b), except as provided in paragraph (2), a person who has been convicted and sentenced and filed an appeal must be detained unless the judicial officer finds:[1]

> (A) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) [release on personal recognizance or unsecured appearance bond] or (c) [release on conditions] of this title; and
>
> (B) that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in — (i) reversal, (ii) an order for a new trial, (iii) a sentence that does not include a term of imprisonment, or (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.

---

[1] Paragraph (2) of 18 U.S.C. 3143 provides: "The judicial officer shall order that a person who has been found guilty of an offense in a case described in subparagraph (A) [a crime of violence], (B) [an offense for which the maximum sentence is life imprisonment or death], or (C) [an offense for which a maximum sentence of ten years or more is prescribed in the Controlled Substances Act] of subsection (f)(1) of section 3142 and sentenced to a term of imprisonment, and who has filed an appeal or a petition for a writ of certiorari, be detained." This paragraph does not apply to Ms. Green.

2

In enacting the Bail Reform Act, "Congress shifted the burden of proof from the government to the defendant" with respect to being released on bail pending appeal. *United States v. Handy*, 761 F.2d 1279, 1283 (9th Cir. 1985). Ms. Green contends that she meets all of the requirements needed to justify release on personal recognizance.[2]

The government concedes that Ms. Green does not pose a flight risk or danger to the community. For Ms. Green's initial appearance in this matter, the government issued a summons; she was never arrested. She was convicted of non-violent crimes. After sentencing, the Court still allowed her to remain released on her own recognizance, as recommended by the probation officer. Furthermore, she has appeared throughout this action whenever she was ordered to do so. Nor does either party claim that the appeal is for the purpose of delay.

The main axis of contention are the last two requirements of 18 U.S.C. 3143(b). Specifically, one question is whether the appeal raises a substantial question of law or fact. The other question is whether, if that substantial question were determined favorably to the defendant on appeal, that decision would likely result in a reversal, an order for a new sentence, or a reduced sentence (that is less than the total time already served plus the expected length of the appeal process). *Handy*, 761 F.2d at 1283.

The Ninth Circuit has held that "the word 'substantial' defines the level of merit required in the question raised on appeal, while the phrase 'likely to result in reversal' defines the type of question that must be presented." *Id*. at 1281. "[A] 'substantial question' is one that is 'fairly debatable,' or 'fairly doubtful.' 'In short, a substantial question is one of more substance than would be necessary to a finding that it was not frivolous.'" *Id.* at 1283.

Ms. Green maintains that there are three substantial questions of law or fact that, if she were to prevail on appeal, would be likely to result in reversal, a new trial, or a reduced sentence: (i) her prosecutions "effectively" criminalized violations of E-Rate administrative regulations; (ii) the government presented insufficient and unreliable evidence of any *per se* violation of the Sherman Act through bid-rigging; and (iii) Ms. Green's sentence was

---

[2] Unless indicated otherwise, internal citations are omitted from all quoted authorities in this order.

3

unreasonably severe, especially when compared to other similarly placed defendants. This order addresses each of Ms. Green's arguments below.

### 1.  VIOLATION OF CRIMINAL STATUTE OR ADMINISTRATIVE REGULATION.

Ms. Green argues that her "prosecutions effectively criminalize violations of merely administrative regulations of the E-Rate program" (Br. 4). The E-Rate program required school districts to contribute a co-pay and deemed certain equipment "ineligible" for funding. Defendant claims that the ambiguous regulations did not provide sufficient notice that her actions would be deemed criminal. Instead, her interpretation of the regulatory scheme — that these impoverished school districts be forgiven the co-pay requirement and receive ineligible equipment — was entirely reasonable, given the purpose of the E-Rate program to provide poor school districts with modern technology.

Defendant's arguments are specious. This order holds that it is *not* "fairly debatable" or "fairly doubtful" that the prosecution created a "hybrid" type of criminal/administrative liability, thereby providing insufficient notice to Ms. Green in violation of her due process rights. Ms. Green was charged with, prosecuted for, and found guilty of eleven counts of plain vanilla wire fraud — not for possible violations of E-Rate administrative regulations. The Court specifically stated in its jury instructions, "All participants in the E-Rate program were required to abide by the FCC regulations, *although the offenses charged in this case are not for violations of FCC regulations*" (Dkt. No. 536 at 8) (emphasis added). The jury instructions then went on to say that Ms. Green was charged with "wire fraud" — that she "knowingly caused misrepresentations to be made to USAC concerning the co-pay and ineligible services and equipment and using interstate faxes or emails to further the alleged fraudulent scheme" (*ibid.*). The FCC regulations were merely a backdrop against which Ms. Green made egregious fraudulent representations.[3]

---

[3] At the hearing on August 19, 2008, Ms. Green's counsel raised — for the first time — the argument that the jury instructions improperly vested the jury with authority to decide a question of law — *i.e.*, jurors had to interpret federal regulations governing the E-Rate program. Nonetheless, the Court nonetheless allowed her to supplement the record with the purportedly improper instructions (Dkt. No. 718). Even taking the letter into account, this order finds the absence of any "substantial question." Although the excerpt did describe the E-Rate program, but it also included the aforementioned instruction that "the offenses charged in this case are

4

"Wire fraud has three elements: (1) a scheme to defraud, (2) use of the wires in furtherance of the scheme and (3) a specific intent to deceive or defraud." *United States v. Garlick*, 240 F.3d 789, 792 (9th Cir. 2001).  The evidence of hardcore fraud and intent to cheat was overwhelming.  The government showed that Ms. Green intentionally created and submitted false and misleading statements regarding a school district purchaser's compliance with the requirements of the federal E-Rate program.  She misrepresented what the funds would be used for and the schools' ability to provide co-pays.  This scheme was intended to obtain E-Rate funds for schools that were not eligible for funding.  During her sentencing, her attorney even stated, "She cut a lot of corners.  She told a bunch of falsehoods to make it work the way that she wanted it to work, the way the schools wants it to work.  That wasn't the way USAC wanted it, but, you know, I think it's — it's interesting, they cite some defendants in other districts that were involved in E-Rate fraud cases, I don't know the particulars.  They are not — not explained, but I think one fellow got three years, another got five, and I think another got six" (Sentencing Tr. 42: 14–21)

Furthermore, Ms. Green cannot contend that she was not on notice of having committed wrongs.  "The general rule that ignorance of the law or a mistake of law is no defense to criminal prosecution is deeply rooted in the American legal system."  *Cheek v. United States*, 498 U.S. 192, 199 (1991).  Nor can Ms. Green escape criminal liability by arguing that she helped bridge the technological gap between poor and more affluent school districts; the justice system does not run on an ends-justify-the-means philosophy.  Accordingly, Ms. Green did not present a "substantial question" regarding her due process claims.

**2.     SHERMAN ACT CONVICTIONS.**

Ms. Green further argues that the government failed to present enough evidence of any *per se* violation of the Sherman Act through bid-rigging.  Spinning a charitable light on her actions, she says that she "was motivated by a sincere desire to see these poor school districts get what richer districts could so easily afford, what was going to continue to be lost to them without such coordinated bids, and that she reasonably believed the regulations did not forbid"

---

not for violations of FCC regulations" (Dkt. No. 536 at 8).

5

1 (Br. 7). According to Ms. Green, the school district purchasers invited Ms. Green to analyze
2 bids and make recommendations. After coordinating with vendors to donate ineligible
3 equipment, she was able to recommend to school district purchasers the financially optimal bid.
4 This did not constitute *per se* bid-rigging, she avers.

5 Again, this order finds Ms. Green's arguments unconvincing. Assuming *arguendo* that
6 her claim raised a "substantial question" (which this order does not concede) and the antitrust
7 convictions were vacated, that decision would not result in a sentence shorter than the total time
8 already served plus the expected duration of the appeal process. This is because, even if the
9 antitrust convictions were vacated, Ms. Green would still be in prison for the wire fraud counts.
10 She was sentenced to sixty months for the fraud counts, thirty months on the antitrust counts,
11 and sixty months on one antitrust count and the conspiracy count. The sixty-month terms were
12 concurrent (Sentencing Tr. at 54–55: 20-25, 1–3). Thus, even if Ms. Green did not face the
13 thirty months for antitrust violations, she would still be in prison for five years for wire fraud.
14 At sentencing, her trial attorney even stated that he thought the "right sentence" was "around
15 five years, maybe a little more" (*id*. at 41: 3–7). Five years is longer than the expected duration
16 of the appeal process.

### 3. REASONABLENESS OF DEFENDANT'S SENTENCE.

18 Defendant finally contends that her sentence is unreasonably severe, when compared
19 with her co-conspirators or defendants in comparable prosecutions. For example, while she
20 herself was sentenced to 90 months, her "right-hand man," George Marchelos, who pled guilty
21 and cooperated, only received 18 months. Ms. Green concludes that the substantial disparity
22 shows that her sentence was unreasonable and violated due process requirements of
23 proportionality and even-handedness.

24 An appellate court reviewing a sentence examines two main factors: (i) whether the
25 district court committed a significant procedural error (*e.g.*, improperly calculating the
26 Guidelines range, treating the Guidelines as mandatory, failing to consider the factors under
27 18 U.S.C. 3553, selecting a sentence based on clearly erroneous facts, or failing to adequately
28 explain the chosen sentence); and (ii) whether the sentence was substantively reasonable under

an abuse-of-discretion standard. *Gall v. United States*, 128 S.Ct. 586, 597 (2007). Because defendant does not allege that there was a significant procedural error, this order only addresses whether there is a "substantial question" that the sentence was substantively reasonable.

Ms. Green first argues that there was an unreasonable disparity between her sentence and that of her co-conspirators. Her co-conspirators, however, all pled guilty prior to trial, accepted responsibility and cooperated with the government. Moreover, at trial, the government presented evidence that Ms. Green was more culpable than her co-conspirators. Witnesses testified that she was the driving force of the charged frauds and conspiracies. Without doubt she was the ringleader and the hub of the conspiracy. These factors explained why her sentence was longer than that of her fellow co-conspirators.

Defendant then says that she had a substantially longer sentence compared to defendants in other E-Rate prosecutions, such as in *United States v. Adame*, CR 06-01082 (S.D. Texas 2007), and *United States v. Bokhari*, CR 04-0056 (E.D. Wisc. 2005). In *Adame*, the defendant was sentenced to 36 months in prison, about a third of Ms. Green's sentence, after a jury found Adame guilty of seven counts of wire fraud. In *Bokhari*, the defendants applied for over $16 million in E-Rate funds on behalf of twenty-one school districts, and they actually received $1.2 million (which they laundered and was never recovered). They were sentenced to 72 months for money laundering and sixty months for mail fraud. In contrast, defendant argues, all of the funds were recovered and she still received a sentence greater than the defendants in *Adame* and *Bokhari*.

Ms. Green's reliance on these cases is misplaced. The defendant in *Adame* was convicted of seven counts of wire fraud, with a loss between $400,000, and $1,000,000. Ms. Green, on the other hand, was found guilty of eleven counts of wire fraud, ten counts of antitrust violations, and one count of conspiracy to commit fraud. The loss amount resulting from her fraud counts was estimated to be about $30 million. So even though Ms. Green's loss amount was about thirty times greater than Adame's, her sentence was only three times greater than Adame's. In addition, her situation was different than that of the defendants in *Bokhari* —

where the defendants *pled guilty* before trial and accepted responsibility for their various charges. The loss amount in *Bokhari* was estimated to be around $16 million, about half of the amount alleged against Ms. Green. Accordingly, it is not "fairly debatable" or "fairly doubtful" that her sentence was substantively unreasonable.

## CONCLUSION

For the foregoing reasons, defendant's motion for release pending appeal is **DENIED**. Ms. Green must report to the United States Marshals Service on the 20th Floor of 450 Golden Gate Avenue, San Francisco, California 94102, by **SEPTEMBER 10, 2008, AT NOON**. Defendant requested ten days to do so, but the Court has granted 21 days instead. Please do not ask for further extensions. The court reporter is directed to prepare the transcript of the proceeding on August 19, 2008, within seven days. Both sides should be provided with a copy.

**IT IS SO ORDERED.**

Dated: August 20, 2008.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE